**EFiled: May 24 2022 01:53PM EDT**
**Transaction ID 67654390**
**Case No. 2021-0420-JTL**

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| ROBERT GARFIELD, derivatively on behalf of THE ODP CORPORATION and individually on behalf of himself and all other similarly situated stockholders, | ) ) ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 2021-0420-JTL |
| | ) |
| QUINCY L. ALLEN, KRISTIN A. CAMPBELL, MARCUS B. DUNLOP, CYNTHIA T. JAMISON, FRANCESCA RUIZ DE LUZURIAGA, V. JAMES MARINO, SASHANK SAMANT, WENDY L. SCHOPPERT, GERRY P. SMITH, DAVID M. SZYMANSKI, NIGEL TRAVIS, and JOSEPH S. VASSALLUZZO, | ) ) ) ) ) ) ) ) ) ) |
| | ) |
| Defendants, | ) |
| | ) |
| and | ) |
| | ) |
| THE ODP CORPORATION, | ) |
| | ) |
| Nominal Defendant. | ) |

## OPINION

Date Submitted: March 1, 2022
Date Decided: May 24, 2022

Brian Farnan and Michael J. Farnan, FARNAN LLP, Wilmington, Delaware; Steven J. Purcell, Douglas E. Julie, Robert H. Lefkowitz, and Anisha Mirchandani, PURCELL JULIE & LEFKOWITZ LLP, New York, New York; *Counsel for Plaintiff.*

Brian M. Rostocki, Benjamin P. Chapple, and Justin M. Forcier, REED SMITH LLP, Wilmington, Delaware; William M. Regan and Allison M. Wuertz, HOGAN LOVELLS US LLP, New York, New York; *Counsel for Defendants.*

**LASTER, V.C.**

In 2019, the stockholders of The ODP Corporation (the "Company") approved an equity compensation plan (the "2019 Plan"). The 2019 Plan authorizes the Company's board of directors (the "Board") to grant awards of performance shares, performance units, restricted stock, restricted stock units, nonqualified stock options, incentive stock options, stock appreciation rights, and other forms of equity-based compensation to officers, employees, non-employee directors, and consultants. A committee of the Board (the "Committee") administers the 2019 Plan.

The 2019 Plan limits the number of performance shares that the Committee can award to any single individual in the same fiscal year. In March 2020, the Committee made two grants of performance shares to the Company's chief executive officer ("CEO"), defendant Gerry P. Smith (the "Challenged Awards"). Each of the Challenged Awards entitled Smith to receive a variable number of performance shares, with the actual amount determined by the Company's performance over a three-year measurement period that will end in 2023. If the Company performs well, then the aggregate number of shares that Smith is entitled to retain will exceed the limit in the 2019 Plan.

The plaintiff is a stockholder of the Company. He contends that by granting the Challenged Awards, the defendants violated the express terms of the 2019 Plan, and he has asserted a direct claim for breach of the 2019 Plan.

The plaintiff also contends that the individual defendants breached their fiduciary duties, and he has sued derivatively on behalf of the Company to recover for the harm that the Company suffered as a result of those breaches. The plaintiff contends that the members of the Committee breached their fiduciary duties by approving the Challenged Awards. He

maintains that Smith breached his fiduciary duties by accepting the Challenged Awards. And he contends that all of the members of the Board breached their fiduciary duties by not fixing the Challenged Awards after the plaintiff brought the violation of the 2019 Plan to their attention. In a separate derivative claim, the plaintiff asserts that Smith has been unjustly enriched by the Challenged Awards.

The defendants moved to dismiss the complaint in its entirety for failing to state a claim on which relief can be granted. The defendants did not seek dismissal of the derivative claims under Rule 23.1.

The defendants' arguments for dismissal conflicted with the express language of the 2019 Plan, the express language of the agreements that govern the Challenged Awards, and the Company's description of the Challenged Awards in its public disclosures. The defendants' arguments frequently contravened settled precedent.

In their opening salvo, the defendants argued that none of the plaintiff's claims are ripe. According to the defendants, a ripe challenge will not exist until it becomes certain how many shares Smith will retain. For decades now, the Delaware courts have dealt with variants of this argument. In earlier versions, defendants have contended that challenges to option grants were not ripe until the options were exercised. Past cases put those arguments to rest, and this decision rejects the latest reincarnation. When the Committee approved the Challenged Awards, the Committee granted a bundle of rights to Smith. The plaintiff can challenge now whether that bundle complies with the 2019 Plan.

The defendants next argued that the plaintiff failed to state a claim for breach of the 2019 Plan because the directors have authority to interpret the 2019 Plan and can determine

2

that the Challenged Awards did not violate it. In an earlier case, this court flatly rejected an identical argument, holding that the authority to interpret an equity compensation plan does not confer authority to evade express restrictions in the equity compensation plan. The court reaches the same result in this case.

Turning to the fiduciary duty claims, the defendants argued that the plaintiff failed to state a claim because the business judgment rule protects the decision to grant the Challenged Awards. Multiple precedents explain that the business judgment rule does not apply to a claim that directors lacked authority to take action under the terms of a governing document. Other authorities hold that when directors grant awards that exceed an express limitation in an equity compensation plan, the allegations support an inference that the directors acted knowingly and intentionally. That inference in turn supports a claim that the directors breached their duty of loyalty by failing to act in good faith, which rebuts the protections of the business judgment rule. Under each line of reasoning, the defendants' argument lacks merit.

The defendants argued in passing that the plaintiff failed to state a claim for breach of fiduciary duty against Smith because the Challenged Awards were legitimate compensation. In several decisions, this court has recognized that a plaintiff states a claim against a fiduciary who accepts an award when the award violates an express limitation in an equity compensation plan. As with the directors who approved the award, the allegation that the award violates an express limitation in the plan supports a claim that the recipient acted knowingly when accepting the award, thereby breaching the duty of loyalty by failing to act in good faith. The court adheres to those precedents.

In contrast to the preceding issues, which are governed by settled law, the plaintiff also advanced a novel theory. According to the plaintiff, all of the directors—including the directors who did not approve the Challenged Awards—breached their fiduciary duties by not fixing the obvious violation after the plaintiff sent a demand letter calling the issue to their attention. There is something disquieting about a plaintiff manufacturing a claim against directors by acting as a whistleblower and then suing because the directors did not respond to the whistle. Nevertheless, the logic of the plaintiff's theory is sound: Delaware law treats a conscious failure to act as the equivalent of action, so if a plaintiff brings a clear violation to the directors' attention and they do not act, then it is reasonably conceivable that the directors' conscious inaction constitutes a breach of duty. The same logic animates a *Caremark* claim that rests on the theory that the board consciously ignored proverbial red flags, although the source of the notice that the board receives is different.

There are obvious policy issues associated with such a claim. The artifice of sending a demand letter and then suing based on the failure to fix the problem could undermine salutary doctrines such as laches that force plaintiffs to bring claims in a timely fashion. It also could enable plaintiffs to expose new directors to litigation risk by presenting them with a problem that they did not create and asserting that they failed to fix it. And there is a lack of precedent for the theory. The wrongful rejection of a demand historically has affected only the question of who controls the derivative claim. It does not appear to have been analyzed as a separate fiduciary wrong.

The plaintiff, however, has pled what seems like one of the strongest possible scenarios for such a claim. The limitation in the 2019 Plan is plain and unambiguous. Under

4

established precedent, the failure to comply with a plain and unambiguous restriction in a stockholder-approved equity compensation plan supports an inference that the directors acted in bad faith. The recipient of the Challenged Awards was a fellow fiduciary who faced the same obligation to fix the flawed grants as the other members of the Board. If there was ever a time when all of the directors had a duty to take action to benefit the Company by addressing an obvious problem, it is reasonably conceivable that this was it. With admitted trepidation about knock-on effects, this decision permits the claim to survive pleading-stage analysis. In light of the policy implications that claims of this sort present, future decisions must consider carefully any attempts by plaintiffs to follow a similar path.

In response to the claim for unjust enrichment, the defendants argued that plaintiff failed to plead any of the required elements. That was plainly an overstatement, because the defendants did not attempt to dispute that one element was met. Because the Challenged Awards represented a transfer of value from the Company to Smith, most of the elements were met easily. The defendants' strongest attack on the claim was their assertion that the plaintiff had to show the absence of an adequate remedy at law. Because the plaintiff had pled other theories of recovery, the defendants contended that the plaintiff could not meet that element. But that assertion rests on a misunderstanding of the role that the element plays. Unjust enrichment arose at common law and is not an inherently equitable claim. A plaintiff therefore can assert a standalone claim for unjust enrichment in a court of equity only if the plaintiff can establish the absence of an adequate remedy at law. Without that showing, jurisdiction in equity does not exist. Here, jurisdiction in equity exists regardless, most obviously because the claim for breach of fiduciary duty is equitable. The court can

5

exercise jurisdiction over the unjust enrichment claim under the clean-up doctrine, regardless of whether the plaintiff otherwise possesses an adequate remedy at law. The plaintiff therefore need not plead the absence of an adequate remedy at law and can proceed.

In a separate line of argument, the defendants advanced a facially unsound ratification defense based on a non-binding, advisory say-on-pay vote. At its annual meeting for 2021, the Company asked its stockholders to vote on a non-binding, advisory resolution regarding the total compensation of the Company's five named executive officers, one of whom was Smith (the "Say-On-Pay Resolution"). The stockholders approved the Say-On-Pay Resolution. Despite having told the stockholders that the Say-On-Pay Resolution was non-binding and would not have any legal effect, the defendants argued that the Say-On-Pay Resolution ratified the Challenged Awards. The defendants' argument is contrary to settled principles of Delaware law. It would undermine a federal statute. Prudence sometimes counsels against making a particular argument. When a theory so blatantly contradicts what the defendants previously told their stockholders, that should be a signal as to the prudent course.

The defendants also argued that the plaintiff's various theories are duplicative and that the plaintiff must pick a horse to ride at the pleading stage. That argument hearkens back to the antiquated principles of common law form pleading. Under that passé approach, a plaintiff had to pick a precise cause of action that fit the facts. A plaintiff could not select different forms and therefore could not plead in the alternative. In 1948, the Delaware courts moved beyond common law pleading by adopting rules modeled on the Federal

6

Rules of Civil Procedure. Court of Chancery Rule 8 expressly permits a plaintiff to plead in the alternative. That is what the plaintiff has done in this case.

There have been and will be cases where it is helpful for a court to analyze the interaction of claims at the pleading-stage. Such an inquiry can assist in the formulation and simplification of issues for trial. In this case, there is no meaningful benefit to that effort. The pleadings are not the right time for the court to determine whether success on one claim might obviate the need for another.

## I. FACTUAL BACKGROUND

The facts are drawn from the complaint and the documents that it incorporates by reference. Dkt. 1 (the "Complaint" or "Compl."). At this procedural stage, the Complaint's allegations are assumed to be true, and the plaintiff receives the benefit of all reasonable inferences.

The defendants asked the court to take judicial notice of public filings with the Securities and Exchange Commission ("SEC"), and they submitted a copy of the 2019 Plan, the proxy statement filed in connection with the vote on the Say-On-Pay Resolution (the "2021 Proxy"), and a Form 8-K announcing the results of the vote. The court has taken judicial notice of these materials. The court also has taken judicial notice of the proxy statement filed in connection with the vote to adopt the 2019 Plan, the Form 8-K announcing the results of the vote on the 2019 Plan, and the exhibits to the Form 8-K which show the terms of the form agreements governing awards under the 2019 Plan.

7

**A.     The Board Adopts The 2019 Plan.**

In 2019, the Board adopted the 2019 Long-Term Incentive Plan, which this decision refers to as the 2019 Plan. *See* Dkt. 6 Ex. A. The 2019 Plan is one of several long-term incentive plans under which the Company has granted equity-based awards. Prior plans included a 2003 Long-Term Incentive Plan, a 2015 Long-Term Incentive Plan, and a 2017 Long-Term Incentive Plan. *See* Office Depot, Inc., Definitive Proxy Statement (Schedule 14A) 27 (Mar. 20, 2019) (the "2019 Proxy").

The 2019 Plan is a relatively standard equity compensation plan. It authorizes the Board to grant awards of performance shares, performance units, restricted stock, restricted stock units, nonqualified stock options, incentive stock options, stock appreciation rights, and other types of equity-based awards (encompassed within a general catch-all category called "Other Awards"). 2019 Plan § 1.3. The 2019 Plan makes a total of 34,000,000 shares of common stock available for issuance pursuant to awards. *Id.* § 4.1.

The Board can grant the awards of equity-based compensation instruments to the Company's officers, employees, non-employee directors, and consultants. The 2019 Plan empowers the Committee to administer the 2019 Plan on behalf of the Board. *See id.* § 3.2(a).

This case concerns two awards of performance shares. The 2019 Plan defines a "Performance Share" as

> an Award under Article 8 of the [2019] Plan that is valued by reference to a share of Common Stock, which value may be paid to the Participant by delivery of cash or other property as the Committee shall determine upon achievement of such performance objectives during the relevant

8

Performance Period as the Committee shall establish at the time of such Award or thereafter.

*Id.* Art. 2 at A-5. The provisions in the 2019 Plan that govern Performance Shares frequently also refer to Performance Units. Using a virtually identical definition, the 2019 Plan defines a "Performance Unit" as

> an Award under Article 8 of the [2019] Plan that has a value set by the Committee (or that is determined by reference to a valuation formula specified by the Committee), which value may be paid to the Participant by delivery of cash or other property as the Committee shall determine upon achievement of such performance objectives during the relevant Performance Period as the Committee shall establish at the time of such Award or thereafter.

*Id.*

The 2019 Plan defines an "Award" as "an award granted to a Participant under the [2019] Plan that consists of one or more [equity-based awards]." *Id.* Art. 2 at A-1. Under the 2019 Plan, each Award must be evidenced by an "Agreement" that defines the terms of the Award. *Id.* § 3.5. To that end, the 2019 Plan states:

> Each Award granted under the [2019] Plan shall be evidenced by an Agreement. Each Agreement shall be subject to and incorporate, by reference or otherwise, the applicable terms and conditions of the [2019] Plan, and any other terms and conditions, not inconsistent with the [2019] Plan, as may be imposed by the Committee . . . .

*Id.* The 2019 Plan defines an "Agreement" as "the written or electronic agreement evidencing an Award granted to a Participant under the [2019] Plan." *Id.* Art. 2 at A-1.

Article 8 of the 2019 Plan addresses Awards of Performance Shares and Performance Units. In that article, the 2019 Plan reiterates the importance of the Agreement governing the Award. Section 8.2 states:

9

> The Performance Share or Performance Unit Agreement shall set forth the terms of the Award, as determined by the Committee, including, without limitation, the number of Performance Shares or Performance Units granted; the purchase price, if any, to be paid for such Performance Shares or Performance Units, which may be equal to or less than Fair Market Value of a share and may be zero, subject to such minimum consideration as may be required by applicable law; the performance objectives applicable to the Performance Shares or Performance Units; and any additional restrictions applicable to the Performance Shares or Performance Units . . . . The Committee shall have sole discretion to determine and specify in each Performance Shares or Performance Units Agreement whether the Award will be settled in the form of all cash, all shares of Common Stock, Other Company Securities, or any combination thereof. Unless and to the extent the Committee specifies otherwise, such settlement will be in the form of shares of Common Stock.

*Id.* § 8.2. Under this provision, the Committee has the "sole discretion to determine and specify . . . whether the Award will be settled in the form of all cash, all shares of Common Stock, Other Company Securities, or any combination thereof," but the Committee must set forth its determination in the Agreement. Unless the Committee specifies otherwise in the Agreement, "settlement will be in the form of shares of Common Stock." *Id.*

Importantly for this case, the 2019 Plan imposes restrictions on the Committee's ability to administer the 2019 Plan. Those restrictions include a series of "Individual Limits" on the magnitude of the Awards that the Committee could grant. *Id.* § 4.2. The limit governing Awards of Performance Shares and Performance Units states:

> The maximum aggregate payout (determined as of the end of the applicable Performance Period) with respect to Performance Units granted in any one fiscal year of the Company to any one Participant shall be six million five hundred thousand dollars ($6,500,000). The maximum number of shares of Common Stock subject to Awards of Performance Shares granted in any one fiscal year of the Company to any one Participant shall be three million five hundred thousand (3,500,000).

*Id.* § 4.2(c). The first sentence caps the maximum aggregate payout "with respect to Performance Units granted in any one fiscal year of the Company to any one Participant." The second sentence caps the maximum number of shares "subject to Awards of Performance Shares granted in any one fiscal year of the Company to any one Participant" (the "Performance Share Limitation").

**B.      The Stockholders Approve The 2019 Plan.**

The Board submitted the 2019 Plan for stockholder approval during the Company's annual meeting in May 2019. In seeking stockholder approval of the 2019 Plan, the Board described the Performance Share Limitation as a "material term" of the 2019 Plan. Compl. ¶ 32; *see* 2019 Proxy at 31. The 2019 Proxy explained that limits in the 2019 Plan on specific types of Awards, including Performance Share Awards, reflect "equity compensation plan best practices" and are "consistent with the interests of [the Company's] shareholders and sound corporate governance practices." 2019 Proxy at 27–28.

The Company's stockholders approved the 2019 Plan. Holders of 394,516,623 shares voted in favor. Holders of 49,918,740 shares voted against. Holders of 465,399 shares abstained, and there were 50,340,377 shares that resulted in broker non-votes. Thus, approximately 79.7% of the votes were cast in favor of the 2019 Plan.

**C.      The Challenged Awards**

On March 10, 2020, the Committee granted the Challenged Awards to Smith. Defendants Kristin A. Campbell, Francesca Ruiz De Luzuriaga, V. James Marino, and Nigel Travis comprised the Committee and approved the Challenged Awards. All four members of the Committee were outside directors.

11

### 1. The TSR Award

The first of the Challenged Awards entitles Smith to receive a number of Performance Shares that will vary based on the Company's total shareholder return relative to its peer group (the "TSR Award"). The TSR Award entitles Smith to receive shares as long as the Company's total shareholder return matches or exceeds the thirtieth percentile in its peer group. Above that threshold, the TSR Award entitles Smith to receive between 533,180 and 2,132,700 shares, depending on the level of the Company's performance.

To operationalize the share calculation, the TSR Award establishes three benchmarks:

- If the Company's total shareholder return falls at the thirtieth percentile, then Smith is entitled to 533,180 shares (the "TSR Threshold").

- If the Company's total shareholder return falls at the fiftieth percentile, then Smith is entitled to 1,066,351 shares (the "TSR Target").

- If the Company's total shareholder return falls at the ninetieth percentile, then Smith is entitled to 2,132,700 shares (the "TSR Maximum").

*See* Compl. ¶ 36; 2021 Proxy at 72. For levels of Company performance falling between the benchmarks, Smith is entitled to a number of shares calculated "using straight line interpolation." 2021 Proxy at 61.

The time period for measuring total shareholder return for purposes of the TSR Award started on March 10, 2020. It will not end until March 10, 2023 (the "Performance Period"). To state the obvious, the Performance Period for the TSR Award has not ended yet. That fact serves as the cornerstone of the defendants' efforts to dismiss the Complaint.

12

Even after the Performance Period ends, the degree to which Smith has met the performance requirement for the TSR Award will not be known immediately. Under the terms of the 2019 Plan, once the Performance Period ends, Smith will "be entitled to receive a payout of the number and value of Performance Shares . . . earned by [him] over the Performance Period, if any, to be determined as a function of the extent to which the corresponding performance objectives have been achieved and any applicable non-performance terms have been met." *Id.* § 8.4 (the "Eligible Award"). The Committee will have an "administratively practicable period following the end of each Performance Period . . . to determine whether the performance objective for such Performance Period has been satisfied." *Id.* § 10.3. Even if a performance objective "is not achieved, the Committee in its sole discretion may pay all or a portion of that Award based on such criteria as the Committee deems appropriate." *Id.*

The Company has not disclosed the specific agreement that governs the TSR Award. The Company has disclosed its standard-form agreement for a Performance Share Award like the TSR Award, and it is reasonable to infer at this stage of the case that the Agreement governing the TSR Award contains those terms. *See* Office Depot, Inc., Current Report (Form 8-K) at Ex. 10.6 (May 7, 2019) (the "TSR Agreement" or "TSR Agr.").

The TSR Agreement recognizes that Smith became entitled to enforceable rights upon its execution. It states that the recipient has "been granted the right to earn shares of the common stock of the Company . . . based upon satisfaction of certain performance conditions." *Id.* § 1.

13

The TSR Agreement specifies that any right to a payout will be settled in shares. The operative provision states: "Vested Performance Shares will be paid by issuance to you and registration in your name of a certificate or certificates for (or evidencing in book entry or similar account) a number of shares of Common Stock equal to the number of Performance Shares subject to payment." *Id.* § 4(b).

Reinforcing the fact that Smith has received an enforceable right to receive the shares that are subject to the TSR Award, the TSR Agreement states that after the Committee determines the Eligible Award, then Smith will "immediately forfeit all Performance Shares other than [his] Eligible Award." *Id.* § 2(a)(i). The TSR Agreement thus operates on the principle that Smith currently possesses a contractual right to receive the shares covered by the TSR Agreement, subject to the future forfeiture of any shares that he may become ineligible to receive.

## 2.     The FCF Award

The second of the Challenged Awards entitles Smith to receive a number of Performance Shares that will vary based on the Company's free cash flow (the "FCF Award"). Like the TSR Award, the FCF Award establishes a threshold that the Company must exceed before Smith is entitled to receive any Performance Shares. For the FCF Award, that threshold is free cash flow of $720 million. Above that level, Smith is entitled to receive between 650,290 and 2,601,140 shares, depending on the level of the Company's performance.

As with the TSR Award, the FCF Award operationalizes the share calculation by establishing three benchmarks:

14

- If the Company generates $720 million in free cash flow during the Performance Period, then Smith is entitled to 650,290 shares (the "FCF Threshold").

- If the Company generates $900 million in free cash flow during the Performance Period, then Smith is entitled to 1,300,578 shares (the "FCF Target").

- If the Company generates $1.08 billion in free cash flow during the Performance Period, then Smith is entitled to 2,601,140 shares (the "FCF Maximum").

Compl. ¶ 38; *see* 2021 Proxy at 72. As with the TSR Award, if the Company's free cash flow falls between the benchmarks, then Smith is entitled to a number of shares calculated using straight line interpolation.

The Performance Period for the FCF Award began at the close of the 2020 fiscal year and will end at the close of the 2022 fiscal year. Thus, like the TSR Award, the Performance Period for the FCF Award has not closed yet. And as with the TSR Award, the Committee will have an "administratively practicable period" of time to determine which FCF Award benchmark, if any, the Company hit. And, like the TSR Award, even if a FCF Award benchmark is not hit, the Committee in its discretion can authorize Smith to receive all or any portion of the FCF Award. 2019 Plan § 10.3.

As with the TSR Award, the Company has not disclosed the specific agreement that governs the FCF Award. As with the TSR Award, the Company has disclosed its standard-form agreement for a Performance Share Award like the FCF Award, and it is reasonable to infer at this stage of the proceeding that the Agreement governing the FCF Award contains those terms. *See* Office Depot, Inc., Current Report (Form 8-K) at Ex. 10.5 (May 7, 2019) (the "FCF Agreement" or "FCF Agr.").

15

Like the TSR Agreement, the FCF Agreement recognizes that Smith became entitled to enforceable rights upon its execution. It states that the recipient has "been granted the right to earn shares of the common stock of the Company . . . based upon satisfaction of certain performance conditions." *Id.* § 1. Like the TSR Agreement, the FCF Agreement specifies that any payout will be made in shares. *Id.* § 4(b). And like the TSR Agreement, the FCF Agreement states that after the Committee determines the "Eligible Award," then Smith will "immediately forfeit all Performance Shares other than [his] Eligible Award." *Id.* § 2(a)(i). The FCF Agreement thus also operates on the principle that Smith currently possesses a contractual right to receive the shares covered by the FCF Agreement, subject to the future forfeiture of any shares that he later becomes ineligible to receive.

**D.      The Interaction Of The Challenged Awards With The Performance Share Limitation**

Recall that the Performance Share Limitation provides that "[t]he maximum number of shares of Common Stock subject to Awards of Performance Shares granted in any one fiscal year of the Company to any one Participant shall be three million five hundred thousand (3,500,000)." 2019 Plan § 4.2(c). The Challenged Awards were granted to Smith in the same fiscal year. The Challenged Awards make a maximum of 4,733,840 shares subject to the TSR Agreement and the FCF Agreement (together, the "Award Agreements").

The following table summarizes the number of shares that are subject to the Challenged Awards at the performance thresholds in the Award Agreements:

| | **Number of Shares** | | |
| --- | --- | --- | --- |
| | **Threshold** | **Target** | **Maximum** |
| **TSR Award** | 533,180 | 1,066,351 | 2,132,700 |
| **FCF Award** | 650,290 | 1,300,578 | 2,601,140 |
| **Total** | 1,183,470 | 2,366,929 | 4,733,840 |

There are many scenarios where the Challenged Awards give Smith the right to receive more shares than the Performance Share Limitation permits. At their maximums, the Challenged Awards exceed the 3,500,000-share limit by 1,233,840 shares. Likewise, if the Company (i) generates total shareholder return sufficient to achieve the TSR Target and (ii) generates free cash flow sufficient to achieve the FCF Maximum, then the combination exceeds the Performance Share Limitation by 167,491 shares.

Nor are these the only cases in which the Challenged Awards give Smith the right to receive more than 3,500,000 shares. Because the Challenged Awards entitle Smith to receive shares at lower performance levels based on straight-line interpolation, there are many outcomes in which Smith is entitled to receive a combination of shares that will exceed 3,500,000.

In June 2020, the Company completed a 1-for-10 reverse stock split. As a result, the total number of shares authorized under the 2019 Plan was reduced proportionally from 34,000,000 shares to 3,400,000 shares. The Performance Share Limitation was reduced proportionally from 3,500,000 shares to 350,000 shares. Any Performance Share Awards granted before the reverse stock split were likewise proportionally reduced. This decision

17

uses the pre-reverse-split numbers because those numbers reflect the language in the 2019 Plan. The parties also used the pre-reverse-split numbers.

## E.    The Say-On-Pay Resolution

On March 12, 2021, the Company filed the 2021 Proxy with the SEC in connection with its upcoming annual meeting. As required by federal law, the 2021 Proxy contained an extensive section that discussed and analyzed the Company's compensation of its senior officers.

As part of that section, the 2021 Proxy described the Challenged Awards. The 2021 Proxy contained a table titled "Grants of Plan-Based Awards in Fiscal Year 2020," which identified Smith's "Estimated Future Payouts Under Non-Equity Incentive Plan Awards" and "Estimated Future Payouts Under Equity Incentive Plan Awards." In a footnote to the table, the 2021 Proxy explained that the columns reflected the "threshold, target, and maximum payouts" for the awards "granted pursuant to the 2019 Plan." 2021 Proxy at 72. Consistent with the language of the 2019 Plan, the footnote stated that each named executive officer "will be eligible to earn all or a portion or an amount in excess of their target share award based on" the Company's performance. *Id.*

The 2021 Proxy asked the stockholders to vote on the Say-On-Pay Resolution, which was a non-binding, advisory resolution on the executive compensation that the Company paid to its five named executive officers, including Smith. The 2021 Proxy did not ask the stockholders to vote on Smith's compensation separately. The 2021 Proxy did not ask the stockholders to vote only on the Challenged Awards. It asked the stockholders

18

to consider the Company's compensation program in its entirety for all five named executive officers. *See id.* at 93.

The 2021 Proxy repeatedly stated that the Say-On-Pay Resolution was non-binding. *On page one of the 2021 Proxy*, the document told stockholders that the Company was seeking "a non-binding advisory vote, of the Company's executive compensation." *Id.* at 1. The section of the 2021 Proxy devoted to the Say-On-Pay Resolution was titled "NON-BINDING ADVISORY VOTE ON COMPANY'S EXECUTIVE COMPENSATION." *Id.* at 93. In the ensuing discussion, the 2021 Proxy explained that the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act") required that the Company present the Company's compensation program for its named executive officers to a "non-binding advisory vote." *Id.* Emphasizing the non-binding status of the vote, the 2021 Proxy explained that the directors nevertheless "value the opinions of our shareholders and will seek to determine the causes of any significant negative voting results." *Id.* The discussion of the Say-On-Pay Resolution concluded with the Board's recommendation that the stockholders "vote for the advisory proposal to approve named executive officer compensation." *Id.*

## F. The Demand Letter And The Response

By letter dated March 18, 2021, plaintiff Robert Garfield sent a letter to the Company in which he asked that the Board "[m]odify the performance share awards granted to Smith by lowering the maximum potential payout to conform with the [Performance Share Limitation]." Compl. Ex. A (the "Demand Letter") at 3. The Demand Letter also asked the Board to "[i]nvestigate whether there are additional violations of the

19

Company's equity plans" and to "[a]dopt and implement internal controls and systems at the Company . . . to prohibit and prevent a recurrence of the 2019 Plan violation . . . and ensure compliance with NASDAQ rules and regulations." *Id.*

By letter dated April 9, 2021, the Company informed Garfield that it had refused to take any action in response to the Demand Letter. *Id.* Ex. B (the "Demand Refusal"). The Company represented that the Board had adopted a policy of interpreting the Performance Share Limitation as applying only to the TSR and FCF Target scenarios. *Id.* at 2. Under those two scenarios, Smith's aggregate award did not exceed 3,500,000. The Company claimed that the Board had the authority to adopt this policy "pursuant to the broad interpretative authority found in [2019] Plan Section 3.2(a)." *Id.* The Company also asserted that because the Performance Periods had not closed, "the number of shares that may become payable to [] Smith pursuant to the [Awards] is not presently known." *Id.*

## G. The 2021 Annual Meeting

On April 21, 2021, the Company held its annual meeting. Holders of 33,119,332 shares voted in favor of the Say-On-Pay Resolution. Holders of 11,117,191 shares voted against. Holders of 18,820 shares abstained. There were 2,276,935 shares subject to broker non-votes. Dkt. 6, Ex. F at Item 5.07 ¶ 4. As a result, holders of approximately 71.1% of the shares voted in favor of the Say-On-Pay Resolution.

## H. This Litigation

On May 13, 2021, the plaintiff filed the Complaint. It contains three counts.

Count I asserts a derivative claim for breach of fiduciary duty. The count alleges that the members of the Committee breached their fiduciary duties by approving the

Challenged Awards. The count alleges that Smith breached his fiduciary duties by accepting the Challenged Awards. And the count alleges that all of the members of the Board violated their fiduciary duties by failing to fix the Challenged Awards in response to the Demand Letter. Compl. ¶¶ 68–75.

Count II asserts a derivative claim for unjust enrichment against Smith. The count alleges that Smith received an unjustified benefit in the form of a right to receive a number of shares that exceeds the Performance Share Limitation. *Id.* ¶¶ 76–81.

Count III asserts a direct claim for breach of contract against the four members of the Committee who approved the Challenged Awards. The count alleges that the 2019 Plan is a contract between the Board and the Company's stockholders and that the members of the Committee breached the contract when they granted the Challenged Awards. The count asserts that all of the members of the Board who rejected the Demand Letter similarly breached the 2019 Plan by allowing Smith to retain his rights under the Challenged Awards. *Id.* ¶¶ 82–86.

The defendants moved to dismiss the Complaint in its entirety under Rule 12(b)(6). They did not move to dismiss the derivative claims under Rule 23.1.

## II. RIPENESS

As their lead argument for dismissal, the defendants contended that the plaintiff's claims are unripe and hence non-justiciable. According to the defendants, all of the plaintiff's claims are "contingent on future events" because it is impossible to determine whether Smith actually will receive shares in excess of the Performance Share Limitation, a fact that cannot be known until after the Performance Periods end. Dkt. 6 at 11. The

21

defendants' argument runs contrary to the plain language of the 2019 Plan and the Award Agreements. Under those documents, Smith presently has the right to receive shares in excess of the Performance Share Limitation, albeit a right that is currently contingent. *See* Dkt. 10 at 10. The defendants' argument also contravenes settled precedent. The plaintiff's claims are ripe for judicial consideration.

"A ripeness determination requires a common sense assessment of whether the interests of the party seeking immediate relief outweigh the concerns of the court in postponing review until the question arises in some more concrete and final form." *XL Specialty Ins. Co. v. WMI Liquidating Tr.*, 93 A.3d 1208, 1217 (Del. 2014) (cleaned up). "Generally, a dispute will be deemed ripe if litigation sooner or later appears to be unavoidable and where the material facts are static." *Id.* (cleaned up). "The first step in this process of common sense evaluation is the identification of the legal questions in the case." *Stroud v. Milliken Enters., Inc.*, 552 A.2d 476, 480 (Del. 1989).

A pivotal question in this case is whether the Challenged Awards violate the Performance Share Limitation. Answering that question presents an issue of contract interpretation.[1] "When interpreting a contract, the role of a court is to effectuate the parties'

---

[1] The 2019 Plan contains a choice of law provision stating that "the [2019] Plan and all Agreements hereunder shall be construed in accordance with and governed by the laws of the State of Florida, without giving effect to any choice of law provisions." 2019 Plan § 16.15(c). The parties did not cite that provision in their briefing.

At oral argument, defense counsel mentioned in passing and without elaboration that the court should consider the potential application of Florida law as part of a

intent." *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006). "Clear and unambiguous language in a[] [contract] should be given its ordinary and usual meaning." *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992). "[A] contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Id.* at 1196. And the court "will not torture contractual terms to impart ambiguity where ordinary meaning leaves no room for uncertainty." *Id.*

The Performance Share Limitation states that "[t]he maximum number of shares of Common Stock subject to Awards of Performance Shares granted in any one fiscal year of the Company to any one Participant shall be three million five hundred thousand (3,500,000)." 2019 Plan § 4.2(c). The defendants argue that because the Performance Share Limitation uses the phrase "maximum number of shares," it is impossible to determine

---

commonsense approach to ripeness. Defense counsel did not explain why or how that consideration would be pertinent. *See* Dkt. 23 at 24–25.

Defense counsel's offhand reference came too late to constitute a meaningful effort to invoke Florida law. Regardless, no one has suggested that Florida law differs from Delaware law with regard to any pertinent principle of contract interpretation. In fact, Florida's approach resembles Delaware's. Under Florida law, as under Delaware law, "[w]here the terms of a contract are clear and unambiguous, the parties' intent must be gleaned from the four corners of the document," and "the language itself is the best evidence of the parties' intent, and its plain meaning controls." *Crawford v. Barker*, 64 So.3d 1246, 1255 (Fla. 2011) (cleaned up). Because the parties did not make an issue of the governing law, and because Delaware and Florida law apply the same interpretive principles, this decision relies on Delaware law.

whether the Performance Share Limitation has been violated before the number of shares that Smith receives is known. Dkt. 13 at 5.

The defendants' argument conflicts with the plain language of the 2019 Plan. Under the Performance Share Limitation, the test turns on the "maximum number of shares" that are "subject to Awards of Performance Shares." The number of shares that are "subject to" the Challenged Awards is the number of shares specified in the Award Agreements. If there is a range, then the Performance Share Limitation looks to the "maximum number of shares." Those details are fixed, known, and not subject to change.

Equally important, the Performance Share Limitation speaks in terms of the number of shares subject to Awards "*granted* in any one fiscal year . . . to any one Participant." 2019 Plan § 4.2(c) (emphasis added). By using that verb, the Performance Share Limitation calls for examining the maximum number of shares that the Committee granted when approving the awards made in the applicable fiscal year.

The Award Agreements confirm this interpretation. Each of the Award Agreements memorializes a grant of an Award as of a designated "Grant Date." The Award Agreements in the record are form agreements that do not identify a grant date for the Challenged Awards; they instead refer to the Grant Date as the date "displayed under the Performance Plan link of the Plan website." TSR Agr. at 1; *accord* FCF Agr. at 1. The record does not reflect the date that is displayed under that link.

It is nevertheless clear from the Company's disclosures (and it would be reasonable to infer in any event) that the Grant Date for each of the Challenged Awards was March 10, 2020. That was the date when the Committee approved the Challenged Awards. The

24

2021 Proxy presents a table entitled "Grants of Plan-Based Awards in Fiscal Year 2020" and identifies the Challenged Awards as having a "Grant Date" of March 10, 2020. 2021 Proxy at 72.

Accordingly, under the plain language of the Performance Share Limitation, the test turns on the "maximum number of shares" that are "subject to" the Challenged Awards as of the date when the Committee granted the Challenged Awards, i.e., March 10, 2020. Those details became known on the Grant Date and are not subject to change.

The defendants' argument rests implicitly on the notion that Smith does not currently have a right to receive the maximum number of Performance Shares, but that theory conflicts with the Award Agreements. Each of the Award Agreements states: "You have been granted the right to earn shares of the common stock of the Company . . . based upon satisfaction of certain performance conditions pursuant to the provision and restrictions contained in the [2019] Plan and this Agreement." TSR Agr. § 1; *accord* FCF Agr. § 1. Each of the Award Agreements provides that if the Committee determines that the Eligible Award involves fewer shares, then Smith "will immediately forfeit all Performance Shares other than [his] Eligible Award." TSR Agr. § 2(a)(i); *accord* FCF Agr. § 2(a)(i). Each of the Award Agreements thus treats the full amount of the Challenged Awards as a vested contract right that Smith possesses, with some of his entitlement subject to forfeiture if the specified conditions are not met.

If the case-specific terms of the 2019 Plan and the Award Agreements were not enough, the defendants' ripeness argument runs contrary to how Delaware decisions have

interpreted grants of equity-based awards for over seven decades.[2] Delaware decisions have always treated the grant of an equity-based award as taking place when it was approved. None of the decisions have looked to the number of shares that the recipient eventually receives. The defendants did not address any of these decisions in their opening brief. The defendants cited just one of the decisions in their reply brief (*Williams v. Ji*), and that was only after the plaintiff identified the case in his answering brief. *See* Dkt. 10 at 14–15; Dkt. 13 at 5–7.

Even then, the defendants ignored the fact that *Williams*, among other cases, specifically rejected the argument that a dispute over a grant of options was not ripe until the participant actually exercised the option and received a specific number of shares. *See* 2017 WL 2799156, at \*4; *see also Elster*, 100 A.2d at 224. There are many reasons why a

---

[2] *See, e.g.*, *Beard v. Elster*, 160 A.2d 731, 733 (Del. 1960) (describing grants of options under plan; referring to approval of grants, not receipt of shares); *Williams v. Ji*, 2017 WL 2799156, at \*4 (Del. Ch. June 28, 2017) (addressing options and warrants that had not yet been exercised and stating, "In this case, the options and warrants have been granted"); *Desimone v. Barrows*, 924 A.2d 908, 918 (Del. Ch. 2007) (explaining the corporate jargon associated with stock option backdating; using "option grant" to refer to the date of grant, not the point at which shares are received); *La. Mun. Police Empls.' Ret. Sys. v. Countrywide Fin. Corp.*, 2007 WL 2896540, at \*1 (Del. Ch. Oct. 2, 2007) (addressing whether stockholder had presented sufficient evidence of backdated option grants to obtain books and records; using term to refer to the grant of the option, not the participant's receipt of shares); *Weiss v. Swanson*, 948 A.2d 433, 437–38 (Del. Ch. 2008) (describing company's practice with respect to "option grants" and using term to refer to the grant, not the receipt); *Conrad v. Blank*, 940 A.2d 28, 32–33 (Del. Ch. 2007) (same); *Ryan v. Gifford*, 918 A.2d 341, 346–48, 354–55 (Del. Ch. 2007) (same); *Stemerman v. Ackerman*, 184 A.2d 28, 33 (Del. Ch. 1962) (same); *Elster v. Am. Airlines*, 100 A.2d 219, 220 (Del. Ch. 1953) (same), *disapproved of on other grounds by Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004).

participant might not exercise an option and receive shares. As the Challenged Awards illustrate, equity-based awards commonly have vesting criteria and are subject to termination events. Options invariably have an exercise price that may be out of the money. Under the defendants' view, those contingencies would require a court to defer addressing any challenge to an equity-based compensation grant until the option was exercised.[3]

Contrary to the defendants' argument, the Delaware Supreme Court has held that for purposes of a challenge to a grant of options, "[t]he wrong of which plaintiff complains is the option contract, not the purchase price and sale of stock pursuant thereto." *Elster*, 100 A.2d at 224. Applying that principle, the *Williams* decision declined to hold that a claim challenging allegedly excessive grants of options and warrants was unripe because the grants only had "speculative future value" that could not yet be determined. 2017 WL 2799156, at *2, *4. The court reasoned as follows:

> In this case, the options and warrants have been granted . . . . Whether the [g]rants . . . constitute a breach of fiduciary duty owed to [the company] and its stockholders can be determined on a record developed from currently available evidence. The precise value of the [g]rants may remain speculative, as [d]efendants assert. But that argument is properly directed to the merits of [p]laintiff's claim, not to ripeness. This case is not unripe merely because there exist valuation questions with respect to the [g]rants.

*Id.* (formatting altered).

---

[3] At oral argument in this case, the court asked defense counsel to assume that the Board granted an employee a tranche of options subject to a four-year vesting schedule in which one-fourth of the grant would vest each year. The court asked whether, in defense counsel's view, a plaintiff would have to wait to mount a challenge to the grant until the options had vested. Defense counsel agreed that under his view of the law, the plaintiff would have to wait until the options had vested. Dkt. 23 at 21–22.

The defendants' position regarding ripeness also conflicts with how the statute of limitations and the related doctrine of laches operate. The fact that the statute of limitations has started to run provides strong evidence that a claim is ripe. *See S'holder Representative Servs. LLC v. Alexion Pharms., Inc.*, 2021 WL 3925937, at *6–7 & n.48 (Del. Ch. Sept. 1, 2021).

"Under Delaware law, a plaintiff's cause of action accrues at the moment of the wrongful act—not when the harmful effects of the act are felt—even if the plaintiff is unaware of the wrong." *In re Coca-Cola Enters., Inc. S'holders Litig.*, 2007 WL 3122370, at *5 (Del. Ch. Oct. 17, 2007), *aff'd sub nom. Int'l Brotherhood Teamsters v. Coca-Cola Co.*, 954 A.2d 910 (Del. 2008) (TABLE). When applying those principles to claims challenging stock options and other equity-based awards, this court has held that the relevant date is the grant date, not the time when the participant receives the shares.[4] The court also has used the grant date when determining whether the contemporaneous ownership doctrine barred challenges to option grants that preceded the plaintiff's ownership.[5]

---

[4] *See Buerger v. Apfel*, 2012 WL 893163, at *5 (Del. Ch. Mar. 15, 2012) (holding that doctrine of laches precluded challenge to option grants that took place more than three years before the filing of the complaint; permitting challenge to option granted within three years of filing); *Weiss*, 948 A.2d at 450–53 (holding that statute of limitations began to run from date of grant but tolling statute of limitations because of false disclosures about the dates on which the grants were issued); *Ryan*, 918 A.2d at 359–60 (same).

[5] *See Conrad*, 940 A.2d at 42; *Ryan*, 918 A.2d at 359; *Desimone*, 924 A.2d at 924–27; *Elster*, 100 A.2d at 224.

Under these precedents, the "wrongful act" is the Board's decision in March 2020 to grant the Challenged Awards. The statute of limitations is three years for a claim for breach of fiduciary duty, a claim for breach of contract, and a claim for unjust enrichment.[6] Under the defendants' approach to ripeness, the plaintiff's claims would not be ripe until after the three-year Performance Period had concluded and the Committee had decided to what extent the performance metrics had been met. At that point, however, the three-year statute of limitations would apply, and the plaintiff's claims would be time-barred.

When asked about this scenario at oral argument, defense counsel responded that the defendants were not arguing that the claims were time-barred. Dkt. 23 at 18–20. That was true but irrelevant. The obvious problem for the defendants is that their interpretation of ripeness doctrine creates an incoherent Catch-22.

The legal question presented by the case can and should be decided now. The Committee granted the Challenged Awards. The question is whether the Challenged Awards violated the Performance Share Limitation. The facts are static. The plaintiff's claims are ripe.

---

[6] *GRT, Inc. v. Marathon GTF Tech., Ltd.*, 2011 WL 2682898, at *6 (Del. Ch. July 11, 2011) ("In Delaware, the default statute of limitations applicable to claims based on contract, including breach of contract, is three years."); *Winner Acceptance Corp. v. Return on Cap. Corp.*, 2008 WL 5352063, at *14 (Del. Ch. Dec. 23, 2008) (stating that the default statute of limitations applicable to an unjust enrichment claim is three years); *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *4 (Del. Ch. July 17, 1998) ("It is well-settled under Delaware law that a three-year statute of limitations applies to claims for breach of fiduciary duty.").

### III. RULE 12(B)(6)

Having decided that plaintiff's claims are ripe, the court's next task is to address the defendants' contention that the complaint fails to state a claim on which relief can be granted. When reviewing a motion to dismiss under Rule 12(b)(6), Delaware courts "(1) accept all well pleaded factual allegations as true, (2) accept even vague allegations as 'well pleaded' if they give the opposing party notice of the claim, [and] (3) draw all reasonable inferences in favor of the non-moving party." *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011). "[T]he governing pleading standard in Delaware to survive a motion to dismiss is reasonable conceivability." *Id.* at 537 (cleaned up). "The reasonable conceivability standard asks whether there is a possibility of recovery." *Garfield v. BlackRock Mortg. Ventures, LLC*, 2019 WL 7168004, at *7 (Del. Ch. Dec. 20, 2019).

"[T]he threshold for the showing a plaintiff must make to survive a motion to dismiss is low." *Doe v. Cahill*, 884 A.2d 451, 458 (Del. 2005). "A court can dismiss for failure to state a claim on which relief can be granted only if it appears with reasonable certainty that the plaintiff could not prove any set of facts that would entitle him to relief." *Id.* (cleaned up). That is, "[o]nly if a court can say that the plaintiff could prevail on no state of facts inferable from the pleadings may it dismiss the complaint under Rule 12(b)(6)." *Ramunno v. Cawley*, 705 A.2d 1029, 1034 (Del. 1998). Nevertheless, Delaware courts "do not . . . simply accept conclusory allegations unsupported by specific facts, nor do [they] draw unreasonable inferences in the plaintiff's favor." *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009).

## A.    Breach Of Contract

The plaintiff asserts that the members of the Committee breached the Performance Share Limitation when approving the Challenged Awards. To reiterate, the Performance Share Limitation states that "[t]he maximum number of shares of Common Stock subject to Awards of Performance Shares granted in any one fiscal year of the Company to any one Participant shall be three million five hundred thousand (3,500,000)." 2019 Plan § 4.2(c). The Committee granted the Challenged Awards to a single Participant (Smith) in a single fiscal year. The maximum number of shares of Common Stock that are subject to the Challenged Awards is 4,733,840. That figure exceeds 3,500,000. The Complaint thus states a claim for breach of the 2019 Plan.

The defendants stage a triple-pronged but ultimately futile attack on the breach of contract claim. First, the defendants argue that the 2019 Plan is not actually a contract. Second, the defendants argue that the plaintiff misreads the Performance Share Limitation. Finally, the defendants argue that the plaintiffs failed to plead damages stemming from the breach. None of these arguments have merit.

### 1.    The 2019 Plan Is A Contract.

For starters, the defendants contend that the 2019 Plan is not a contract. This court has ruled on this issue expressly and held that a stockholder-approved equity compensation plan is a contract between the board of directors and its stockholders. *See Sanders v. Wang*, 1999 WL 1044880, at *6 (Del. Ch. Nov. 8, 1999) (interpreting a key employee stock ownership plan and describing it as "simply a contract between [company] shareholders . . ., on one hand, and the defendant board of directors . . ., on the other"); *see also Quadrant*

31

*Structured Prods. Co., Ltd. v. Vertin*, 2014 WL 5465535, at *3 (Del. Ch. Oct. 28, 2014) (describing stock and equity compensation plans as "entity-specific contractual agreements"); *cf. Fox v. CDX Hldgs., Inc.*, 2015 WL 4571398, at *22–23 (Del. Ch. July 28, 2015) (holding that option holder proved a claim for breach of contract where board failed to comply with requirement in stock option plan), *aff'd*, 141 A.3d 1037 (Del. 2016).

The defendants claim that Delaware decisions "disagree" on whether an equity compensation plan constitutes a contract. *See* Dkt. 6 at 22–23. To support that assertion, they strive to build on the Delaware Supreme Court's observation in *Friedman v. Khosrowshahi* to the effect that there was an issue where this court's decisions "arguably conflict." 2015 WL 1001009, at *1 (Del. Mar. 6, 2015) (TABLE). The "arguable" conflict identified in *Friedman* concerned the role of demand futility and Rule 23.1. The dispute did not concern whether an equity compensation plan constitutes a contract.

In *Friedman*, the plaintiff alleged that the defendants breached their fiduciary duties by violating the terms of an equity compensation plan. The plaintiff framed their claim as derivative, and the defendants moved to dismiss the claim under Rule 23.1 for failure to plead that demand was futile. The Court of Chancery granted that motion, finding that the complaint did not plead sufficient facts to establish demand futility. In affirming that ruling, the Delaware Supreme Court implied that the plaintiff could have asserted a direct claim for breach of contract that would not have necessitated a demand futility analysis, but the high court declined to rule on the issue:

> [B]ecause the defendants framed their motion as one for dismissal for failure
> to make a demand, the Court of Chancery framed its decision in those terms.
> We affirm the Court of Chancery's judgment, but stress the distinction

between this case and a situation that is not before us. Here, the stockholder plaintiff chose to sue the directors for breach of fiduciary duty. The Chancellor's careful decision thus focused on the question presented to him, *i.e.*, whether there was some basis under *Aronson v. Lewis* to excuse demand. The Chancellor correctly found that on the facts of this case, neither of the two prongs of the *Aronson* test was satisfied, and correctly examined what would be necessary to hold the independent directors liable for monetary damages as part of that analysis. What was not before the Chancellor was the question of whether a stockholder plaintiff must plead demand excusal if her claim for relief is a breach of a stockholder-approved plan as a contract, and she seeks recovery under contract law. That question is one that this Court has not decided and on which Court of Chancery decisions arguably conflict.

*Id.* (footnotes omitted). The high court then stated, "Analytically, a contract claim under such a plan could be subject to distinctive treatment for demand excusal purposes as a breach of fiduciary duty claim, because directors arguably have no discretion to violate the terms of a stockholder-adopted compensation plan whose terms cannot be amended without the stockholders' approval." *Id.*

As examples of cases that applied the contractual framework, the *Friedman* court cited *Allen v. El Paso Pipeline GP Co., L.L.C.*, 90 A.3d 1097 (Del. Ch. 2014), and *Ryan*, 918 A.2d 341. The *Allen* decision explained why a plaintiff could plead a claim for breach of contract without having to satisfy a demand-futility analysis:

Boards of directors have no discretion to exceed the intra-entity limitations on their authority. The possession of discretionary authority is a prerequisite for the policy-based deference of the business judgment rule. Without authority to take the action in question, a board has no business judgment to exercise. Looked at from the opposite perspective, precisely because directors have wide discretion to act within their legal authority, stockholders have a right to insist that directors not take action beyond the limits of that authority. To overlay stockholders' contractual rights with a presumption that boards determine when those rights can be asserted would conflict with our law's long-standing protection of stockholder rights, of which voting rights are an important but by no means exclusive example. Stockholders can assert those rights directly, without first seeking permission from the board.

33

90 A.3d at 1108.

In support of that proposition, the *Allen* court discussed decisions interpreting equity compensation plans:

> A series of decisions involving Rule 23.1 motions to dismiss has reached the same conclusion implicitly, although ironically within the framework of a demand futility analysis. These cases hold that when a board violates contractual limits on its authority, that decision is not a business judgment to which deferential fiduciary duty review applies, rendering demand futile under the second prong of *Aronson*. In my view, the same reasoning demonstrates that the claim is not derivative at all. The analytical implication has not proved salient in the Rule 23.1 context because for purposes of a motion to dismiss, the endpoint is the same: the plaintiff can proceed with the lawsuit. *See Weiss v. Swanson*, 948 A.2d 433, 441 (Del. Ch. 2008) (recognizing authority claim as a basis for demand futility under the second prong of *Aronson* because "[a]lthough the defendants are correct that compensation decisions are typically protected by the business judgment rule, the rule applies to the directors' grant of options pursuant to a stockholder-approved plan only when the terms of the plan at issue are adhered to"); *Ryan v. Gifford*, 918 A.2d 341, 355 (Del. Ch. 2007) (recognizing authority claim as a basis for demand futility under the second prong of *Aronson* because "the alleged facts suggest that the director defendants violated an express provision of two option plans and exceeded the shareholders' grant of express authority"); *Cal. Pub. Empls.' Ret. Sys. v. Coulter*, 2002 WL 31888343, at *10 (Del. Ch. Dec. 18, 2002) (holding that "[t]he business judgment rule may not be invoked to shelter unauthorized actions of a board of directors" and excusing demand under the second prong of *Aronson*); *id.* at *11 (explaining that "[a]ny action of the board that falls outside the rather broad scope of its authority is not entitled to the protection of the business judgment rule," causing demand to be excused); *Sanders v. Wang*, 1999 WL 1044880, at *5 (Del. Ch. Nov. 8, 1999) (noting that " each plaintiff's core allegation [is] that the board exceeded its authority" and finding that "the plaintiffs have sufficiently pleaded facts which cast doubt that the board's alleged acts could be the result of a valid exercise of business judgment," and "[t]herefore, demand [was] excused").

*Id.* at 1108 n.6. Each of the decisions identified in this passage treated the equity compensation plan as a binding contract, but nevertheless conducted a Rule 23.1 analysis,

34

albeit one where the contractual aspects of the plan proved dispositive. The second decision

that the Delaware Supreme Court cited—*Ryan*—was one of those cases.

As its example of a case that did not treat the claim as one for breach of contract

and instead considered whether demand was futile under *Aronson*, the *Friedman* decision

cited *Pfeiffer v. Leedle*, 2013 WL 5988416 (Del. Ch. Nov. 8, 2013). That decision also

treated an equity compensation plan as a contract, and it followed the same analytical

approach taken in *Ryan*, *Sanders*, and the other cases that this court cited in *Allen*. The

*Pfeiffer* decision stated, for example, that "*Sanders* teaches that when a plaintiff presents

particularized factual allegations that indicate that the board clearly violated an

unambiguous provision of a stock plan, it is proper to infer that such violation was

committed knowingly or intentionally and, therefore, that demand should be excused." *Id.*

at *6. The *Pfeiffer* court determined that the plaintiff sufficiently alleged that the board had

violated a plain and unambiguous restriction, and it therefore held that demand was

excused. *Id.* at *7.

Delaware decisions thus do not conflict on whether a stockholder-approved equity

compensation plan is a contract. All of the decisions treat the plan as a contract. The

precedents differ in their mode of analysis, because in some of the decisions, the plaintiff

asserted a direct claim for breach of contract, while in others, the plaintiff asserted a

derivative claim for breach of fiduciary duty based on the failure to comply with the

contract. Under both approaches, the plan operates as a contract. Indeed, for purposes of

pleading-stage motion practice under Rules 12(b)(6) and 23.1, the choice between the two

routes is usually trivial because, when the complaint pleads that the directors violated a

plain and unambiguous provision of an equity compensation plan, that fact supports an inference of bad faith that renders demand futile as to the directors who approved the problematic awards.

In this case, the arguable conflict that the Delaware Supreme Court identified and which the defendants seek to raise has no salience. The first reason is because the plaintiff did not choose between a contract theory and a fiduciary duty theory. The plaintiff asserted both. As discussed below, that is both permissible under Court of Chancery Rule 8(e), which permits pleading in the alternative, and it recognizes that the theories serve different purposes and can support different remedies.

The second reason is because the defendants did not move to dismiss under Rule 23.1. There accordingly is no reason to evaluate whether a demand-futility analysis would be necessary for purposes of the breach of contract claim. Even if the court assumed that Rule 23.1 applied, demand would be futile under the logic of *Pfeiffer*, *Weiss*, *Ryan*, *Coulter*, and *Sanders*.

The defendants have not cited any authority to support their argument that the court should dismiss the breach of contract claim because there is no contract. There is a contract—the 2019 Plan.

### 2. The Plain Meaning Of The Performance Share Limitation

Next, the defendants debate the meaning of the Performance Share Limitation. Because the court interprets the 2019 Plan as a contract, standard principles of contract interpretation apply. *See*, *supra*, Part II (summarizing operative principles of contract interpretation).

36

Lest anyone forget, the Performance Share Limitation states that "[t]he maximum number of shares of Common Stock subject to Awards of Performance Shares granted in any one fiscal year of the Company to any one Participant shall be three million five hundred thousand (3,500,000)." 2019 Plan § 4.2(c). The plain language requires looking at the "maximum number of shares" that are "subject to Awards of Performance Shares granted in any one fiscal year . . . to any one Participant" and determining whether that number exceeds 3,500,000. The plain language of the Performance Share Limitation does not permit the Committee to grant awards to a single participant in a single fiscal year where the "maximum number of shares" that is "subject to" the Awards would exceed 3,500,000.

As this decision has noted, the plaintiff pleads that the maximum number of shares that are subject to the Challenged Awards is 4,733,840. The plaintiff pleads that the Challenged Awards were granted to the same individual in the same fiscal year. It is self-evident that 4,733,840 exceeds 3,500,000. The plaintiff has therefore stated a claim for breach of the 2019 Plan.

### a. The Interpretation Provision

In their first attempt to explain why the plaintiff has not stated a claim, the defendants assert that the phrase "maximum number of shares . . . subject to Awards" is unclear such that the directors have the ability to interpret it. The defendants then argue that the directors properly adopted a policy of interpreting the Performance Share Limitation as applying only to the FCF Target and TSR Target scenarios.

37

In making this argument, the defendants rely on Section 3.2(a) of the 2019 Plan, which states:

> Subject to the provisions of the [2019] Plan, the Committee shall have the full and discretionary authority to (i) select the persons who are eligible to receive Awards under the [2019] Plan, (ii) determine the form and substance of Awards made under the [2019] Plan and the conditions and restrictions, if any, subject to which such Awards will be made, (iii) modify the terms of Awards made under the [2019] Plan, (iv) interpret, construe and administer the [2019] Plan and Awards granted thereunder, (v) make any adjustments necessary or desirable in connection with Awards made under the [2019] Plan to eligible Participants located outside the United States, and (vi) adopt, amend, or rescind such rules and regulations, and make such other determinations, for carrying out the [2019] Plan as it may deem appropriate.

*Id.* § 3.2(a) (the "Interpretation Provision"). A related section of the 2019 Plan provides that "[d]ecisions of the Committee on all matters relating to the [2019] Plan shall be in the Committee's sole discretion and shall be conclusive, final and binding on all parties." *Id.* § 3.2(c).

The defendants cannot rely on the Interpretation Provision to escape the plain meaning of the Performance Share Limitation. As a threshold matter, the plain language of the Interpretation Provision establishes that the Committee's authority to make discretionary decisions is "[s]ubject to the provisions of the [2019] Plan." *Id.* § 3.2(a). The Performance Share Limitation is a provision of the 2019 Plan. The defendants' ability to make discretionary determinations is "[s]ubject to" clear limitations like the Performance Share Limitation.

The "[s]ubject to" language in the Interpretation Provision provides explicitly for the same outcome that would apply even if that phrase did not appear. "Boards of directors have no discretion to exceed the intra-entity limitations on their authority." *Allen*, 90 A.3d

38

at 1108. The limitations on the authority possessed by a board of directors or similar governing body establish the metes and bounds within which that body can exercise its discretionary authority. The board has no power to act outside those limits. *See JER Hudson GP XXI LLC v. DLE Invs., L.P.*, — A.3d —, 2022 WL 1296831, at *19 (May 2, 2022).

This court has addressed this very issue in the context of an equity compensation plan. In *Sanders*, this court asked: "Can a board of directors rely upon its purported discretion to administer a shareholder-approved 'key employee stock ownership plan' to grant key executives more shares than expressly authorized by the plain language of the [plan]?" 1999 WL 1044880, at *1. The court answered "[n]o." *Id.* So too here. The Committee lacks the authority to take action that contravenes the express limitation of the 2019 Plan.

The Committee would have authority under the Interpretation Provision to interpret and apply an ambiguous provision.[7] In this case, the defendants have not advanced a reasonable reading of the Performance Share Limitation that could render the provision

---

[7] As Vice Chancellor Zurn recently explained, the grant of authority to a committee to make determinations under an equity compensation plan can be viewed as a form of expert-determination provision. *See Terrell v. Kiromic Biopharma, Inc.*, 2022 WL 175858 (Del. Ch. Jan. 20, 2022). The contractual provision that confers authority on the expert establishes the bounds of the expert's authority. *Penton Bus. Media Hldgs., LLC. v. Informa PLC*, 252 A.3d 445, 458 (Del. Ch. 2018). Under the express terms of the Interpretation Provision and this court's decision in *Sanders*, the Interpretation Provision does not grant the Committee authority to take action that contravenes an express limitation in the 2019 Plan.

ambiguous. The plain language of the provision places a cap on the *maximum number* of shares that are *subject to* Awards.

Nonetheless, the defendants argue that in response to the Demand Letter, they adopted a policy to use in determining whether an Award complies with the Performance Share Limitation. *See* Demand Refusal at 3. The defendants explain that under the policy they adopted, compliance with the Performance Share Limitation is measured using the "target" benchmark in a performance share award, not the maximum benchmark (the "Target Award Policy"). *See id.* (explaining that under the Board's policy, the "Performance Share limit serves as a governor on the face or target number of shares underlying Performance Share awards granted during a year"). Viewed through the lens of the Target Award Policy, the Challenged Awards do not violate the Performance Share Limitation because at their target levels, the combined TSR and FCF Awards do not exceed 3,500,000 shares.

When advancing this argument, the defendants did not cite to a specific provision of the 2019 Plan. They claimed instead to have crafted the Target Award Policy to address the issue that the Demand Letter raised. But the defendants did not conjure the Target Award Policy from the ether. They plainly drew on provisions in the 2019 Plan that address how Awards are treated for purposes of the 2019 Plan's share pool.

The 2019 Plan authorizes a share pool of 34,000,000 shares or share equivalents that can be subject to Awards (the "Share Pool"). 2019 Plan § 4.1. When an Award is granted, the Award reduces the number of available shares in the Share Pool. Different types of Awards count against the Share Pool at different rates. Every share that is subject

40

to a stock option, stock appreciation right, or similar Award results in a deduction of one share from the Share Pool. *Id.* § 4.1(a). Each share of Restricted Stock or any Restricted Unit that may be settled in shares of common stock, or any Other Award settled in shares of common stock results in a deduction of 1.5 shares from the Share Pool. *Id.* § 4.1(b). The same section provides a special rule for Performance Shares and Performance Units that are settled in common stock:

> Each Performance Share that may be settled in shares of Common Stock shall be counted as 1.5 shares subject to an Award, based on the number of shares that would be paid under the Performance Share for achievement of target performance, and deducted from the Share Pool. Each Performance Unit that may be settled in shares of Common Stock shall be counted as a number of shares subject to an Award based on 1.5 multiplied by the number of shares that would be paid under the Performance Unit for achievement of target performance, with the number determined by dividing the value of the Performance Unit at the time of grant by the Fair Market Value of a share of Common Stock at the time of grant, and this number shall be deducted from the Share Pool. In both cases, in the event that the Award is later settled based on above-target performance, the number of shares of Common Stock corresponding to the above-target performance, calculated pursuant to the applicable methodology specified above, shall be deducted from the Share Pool at the time of such settlement; in the event that the Award is later settled upon below-target performance, the number of shares of Common Stock corresponding to the below-target performance, calculated pursuant to the applicable methodology specified above, shall be added back to the Share Pool. Performance Shares and Performance Units that may not be settled in shares of Common Stock shall not result in a deduction from the Share Pool.

*Id.* § 4.1(c) (the "Share Pool Rule"); *see* 2019 Proxy at 30. The 2019 Proxy summarized these rules by stating that if the Committee made full value Awards, then those shares would "count against the shares reserved for issuance at a higher rate than appreciation awards (such as stock options and [stock appreciation rights])." 2019 Proxy at 27.

41

The Share Pool Rule only determines how the grant of a Performance Share affects the number of shares in the Share Pool. The Share Pool Rule does not apply to the Performance Share Limitation. The Performance Share Limitation is in a different subsection of the 2019 Plan that lays out the "rules [that] apply to Awards under the Plan." *Id.* § 4.2 The Performance Share Limitation does not reference "target performance." All it says is that "[t]he maximum number of shares of Common Stock subject to Awards of Performance Shares granted in any one fiscal year of the Company to any one Participant shall be three million five hundred thousand (3,500,000)." *Id.* § 4.2(c). There is no "target" qualifier.

The Share Pool Rule and the Performance Share Limitation operate in different ways and serve different purposes. The Share Pool Rule is an administrative provision that provides a metric for managing the Share Pool. For each of the Challenged Awards, the maximum number of shares subject to the Award is twice the target Award. If the 2019 Plan required that the Share Pool be reduced by the maximum number of shares that were subject to a Performance Share Award, then 25% more shares would be deducted from the Share Pool. The Share Pool Rule keeps more shares available for potential issuance by using 1.5x the target number.

The Performance Share Limitation serves a different purpose. It places a hard cap on the maximum number of Performance Shares that the Committee can grant to a single person in a single fiscal year. The Performance Share Limitation expressly refers to the "maximum number of shares of Common Stock subject to Awards." The Share Pool Rule has no role to play in the calculation that the Performance Share Limitation requires.

42

The defendants have tried to rewrite the 2019 Plan by giving the Share Pool Rule a new name, claiming it was a policy, and then applying that policy to the Performance Share Limitation. The defendants cannot use the Interpretation Provision to alter the plain terms of the 2019 Plan. Whether called the Share Pool Rule or the Target Award Policy, the interpretive principle that the defendants invented has no application to the Performance Share Limitation. The defendants therefore cannot rely on the Interpretation Provision to obtain dismissal of the breach of contract claim.

### b. The Form Of Consideration Provision

At oral argument, the defendants offered a new theory about why the plaintiff could not state a claim for breach of the Performance Share Limitation (or at least not yet). The defendants argued that under Section 8.2 of the 2019 Plan, the Committee has the "sole discretion" to decide whether a Performance Shares Award "will be settled in the form of all cash, all shares of Common Stock, Other Company Securities, or any combination thereof." *Id.* § 8.2 (the "Form of Consideration Provision"). The defendants suggested that if the Company performs well and Smith becomes entitled to receive a number of shares that would exceed the Performance Share Limitation, then the Committee could rely on the Form of Consideration Provision and elect to award the excess shares in the form of cash or Other Company Securities. At that point, in the defendants' eyes, Smith would not have received shares that exceed the Performance Share Limitation.

The defendants' argument misreads the Form of Consideration Provision. That provision indeed states that the "the Committee shall have sole discretion to determine and specify in each Performance Shares or Performance Units Agreement whether the Award

43

will be settled in the form of all cash, all shares of Common Stock, Other Company Securities, or any combination thereof." *Id.* But the Form of Consideration Provision only authorizes the Committee to specify the means of settlement *in the Agreement governing the Performance Share Award*. The Form of Consideration Provision does not authorize the Committee to transmogrify the Award at some later date.

The Award Agreements each state that the "form of payment" is in "a number of shares of Common Stock equal to the number of Performance Shares subject to payment." TSR Agr. § 4(b); FCF Agr. § 4(b). Smith has the right to insist on settlement in the form of shares of stock. The Committee does not have the sole discretion to change the terms of the grant.

Although the defendants did not make this point at oral argument, they might respond that the Committee and Smith could amend the Challenged Awards by agreeing to settle the excess shares in the form of cash or Other Company Securities. Doubtless they could, but that possibility does not help the defendants escape their past violation of the Performance Share Limitation, because the Performance Share Limitation tests an Award at the time of grant. The Performance Share Limitation caps the "maximum number of shares of Common Stock subject to Awards of Performance Shares granted in any one fiscal year." 2019 Plan § 4.2(c). The Committee granted the Challenged Awards when it approved them. *See*, *supra*, Part II. At that point, the Committee made a maximum of 4,733,840 shares "subject to" the Challenged Awards.

What the Committee and Smith might agree to later is irrelevant to the existing violation of the Performance Share Limitation. The Committee and Smith can agree to new

terms that would fix the violation, but they cannot go back in time and avoid the original violation.

At oral argument, the defendants sought to support their claim that the Committee could invoke the Form of Consideration Provision to recharacterize a portion of the Challenged Awards by citing a difference between Section 4.1(c), which establishes the Share Pool Limit, and Section 4.2, which contains the Performance Share Limitation. *See* Dkt. 23 at 26–27. The defendants then pointed to the last clause in Section 4.2, the "Individual Limits" section, which provides that "[t]he multipliers specified in subsections (a) through (g) of Section 4.1 shall not apply for purposes of applying the foregoing limitations of this Section 4.2." *Id.* § 4.2. They asserted that "[t]he fact that the [2019] [P]lan expressly does not provide a rule for counting performance shares for individual cap purposes [in Section 4.2], but does for aggregate purposes [in Section 4.1], means that the [C]ommittee retains discretion on how to make that determination." Dkt. 23 at 27–28; *see id.* at 29 ("Given how that plan is set up, then, there is significant discretion left in the [C]ommittee for purposes of determining how to count shares at the outset of a plan, especially when those plans can be settled with cash and/or common stock when the performance period expires.").

That reading is both irrelevant and unreasonable. It is irrelevant because it ignores the fact that the Form of Consideration Provision requires that the Award Agreement specify the means of settlement; the Committee cannot decide on it later. The interpretation is unreasonable because it disregards the plain meaning of the statement that "[t]he multipliers specified in subsections (a) through (g) of Section 4.1 shall not apply for

45

purposes of applying the foregoing limitations of this Section 4.2." 2019 Plan § 4.2. By including this language, the 2019 Plan makes clear that each designated numerical limitation in Section 4.2, such as the figure of 3,500,000 shares in the Performance Share Limitation, really means that number, i.e., 3,500,000 shares. It does not mean that the 1.5x multiplier applies to the number of shares subject to the Award, such that an Award of 2,400,000 shares should be regarded as the equivalent of 3,600,000 shares (i.e., 2,400,000 x 1.5) and deemed to violate the Performance Share Limitation. It also does not mean that the 1.5x multiplier could apply to the 3,500,000 figure, such that the limit of 3,500,000 shares really means a limit of 5,250,000 shares. The plain meaning of the last sentence of Section 4.2 establishes that a maximum of 3,500,000 shares really does mean a maximum of 3,500,000 shares.

Finally, the defendants' interpretation is unreasonable because it would undermine the effectiveness of the Performance Share Limitation. Under the defendants' theory, the Committee theoretically could grant Smith ten million shares, and the grant would not violate the Performance Share Limitation because the Board could determine to allow Smith to receive 3,500,000 shares in the form of equity and to deliver the value-equivalent of the other 6,500,000 shares in the form of cash or other securities. The 2019 Plan does not permit that result.

The defendants cannot defeat the plaintiff's claim of breach by arguing that the Committee could transfigure a portion of the Challenged Awards from shares into some other form of consideration. Once again, the plaintiff has pled breach.

### 3. Plaintiff Has Adequately Pled Harm.

In their last attempt at escaping the breach of contract claim, the defendants argue that the plaintiff cannot state a claim for breach of contract because a necessary element of the claim is damages. Dkt. 6 at 22–23. The defendants say that at present, the plaintiff "cannot allege . . . any 'resultant damage'" because Smith has not yet received any "final award." *Id.* at 23. The defendants thus wrongly maintain that the plaintiff must allege monetary damages to state a claim.

"In alleging a breach of contract, a plaintiff need not plead specific facts to state an actionable claim." *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003). At the motion to dismiss stage it is sufficient to simply allege "first, the existence of the contract . . .; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff." *Id.* So long as the complaint alleges that an "agreement[] ha[s] been breached," and even if it is not clear that the non-breaching party has "suffer[ed] immediate quantifiable harm, the equitable powers of this Court afford [it] broad discretion in fashioning appropriate relief." *Universal Studios Inc. v. Viacom Inc.*, 705 A.2d 579, 583 (Del. Ch. 1997). It is thus more accurate to describe the elements of a claim for breach of contract as "(i) a contractual obligation, (ii) a breach of that obligation by the defendant, and (iii) a causally related injury that warrants a remedy, such as damages or in an appropriate case, specific performance." *AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, 2020 WL 7024929, at *47 (Del. Ch. Nov. 30, 2020), *aff'd*, 268 A.3d 198 (Del. 2021).

These holdings comport with blackletter sources. Put simply, "[a] breach of contract gives rise to a right of action." 23 Williston on Contracts § 63:8 (4th ed.), Westlaw (databased updated May 2022). That is because any "unexcused failure to perform a contract is a legal wrong. An action will therefore lie for the breach although it causes no injury." 24 Williston on Contracts, *supra*, § 64:9; *see Norman v. Elkin*, 860 F.3d 111, 128–29 (3d Cir. 2017).

An award of monetary damages is one possible form of relief that a plaintiff can receive for a breach of contract. If warranted, a plaintiff may obtain a decree of specific performance or other equitable relief. *See Eureka VII LLC v. Niagara Falls Hldgs. LLC*, 899 A.2d 95, 107, 113–16 (2006) (granting motion for summary judgment and fashioning a remedy despite the fact that there was no apparent discrete financial harm). Or a court can vindicate a breach of contract that does not give rise to monetary damages through an award of nominal damages. *See* Restatement (Second) of Contracts § 346(2) (Am. L. Inst. 1981), Westlaw (database updated Oct. 2021) ("If the breach caused no loss or if the amount of the loss is not proved under the rules stated in this Chapter, a small sum fixed without regard to the amount of loss will be awarded as nominal damages."); *id.* cmt. b ("Although a breach of contract by a party against whom it is enforceable always gives rise to a claim for damages, there are instances in which the breach causes no loss. . . . In all these instances the injured party will nevertheless get judgment for nominal damages.").

Thus, a plaintiff need not plead monetary damages to sustain a breach of contract claim. The plaintiff need only plead causally related harm, which the plaintiff can accomplish by pleading a violation of the plaintiff's contractual rights.

48

In this case, the allegations of the Complaint support an inference of harm. The plaintiff has pled that the members of the Committee committed an unexcused breach of the Performance Share Limitation. That is sufficient.

The facts as alleged in the Complaint support obvious potential remedies. Prior decisions of this court have recognized that the court can impose a range of possible remedies to address equity-based awards that violate a mandatory limitation in a stockholder-approved compensation plan.[8] The court could award some form of class-based damages, or the court could vindicate the plaintiff's theory with an award of nominal damages. *See Ivize of Milwaukee, LLC v. Complex Litig. Support, LLC*, 2009 WL 1111179, at *12 (Del. Ch. Apr. 27, 2009) ("Even if compensatory damages cannot be or have not been demonstrated, the breach of a contractual obligation often warrants an award of nominal damages."). More likely remedies for the breach of contract claim would involve declaratory or equitable relief. The court could issue a declaratory judgment invalidating the Challenged Awards. The court could issue injunctive relief preventing the enforcement of the Challenged Awards. The court could rescind the Challenged Awards.

---

[8] *See Pfeiffer*, 2013 WL 5988416, at *3 (denying defendant's motion to dismiss complaint which sought "rescission of any stock options awarded to [the defendant] in excess of what was allowed under the [company's stock incentive plan]"); *Weiss*, 948 A.2d at 450 (observing that "even if the defendants do not exercise any [of the challenged] options at all, the court may still be able to fashion an appropriate remedy, such as repricing or rescinding the options"); *Ryan*, 918 A.2d at 361 (contemplating that the court could use "expert testimony to determine the true value of the [unauthorized] option grants or simply rescind them").

49

The plaintiff has pled facts making it reasonably conceivable that (i) a contract exists, (ii) the members of the Compensation Committee breached the contract by approving the Challenged Awards, and (iii) the stockholders were harmed by the breach. That is all that is required.

### 4. The Broader Breach Of Contract Claim Against All Defendants

When framing the claim for breach of contract, the plaintiff not only asserts that the members of the Committee breached the 2019 Plan when they granted the Challenged Awards, but also that all of the members of the Board who rejected the Demand Letter breached the 2019 Plan when they allowed Smith to maintain his rights under the Challenged Awards. *Id.* ¶¶ 82–86. It is reasonably conceivable that the latter theory could support a claim on which relief can be granted, but the nature of the claim is more nuanced than the claim against the members of the Committee.

For the reasons already discussed, it is reasonably conceivable that the Committee breached the Performance Share Limitation when the Committee approved the Challenged Awards. That claim became ripe when the Committee approved the Challenged Awards, thereby causing Smith to receive contract rights which, on the facts pled, violate the Performance Share Limitation.

One consequence of the Committee's actions constituting a breach of the Performance Share Limitation is that the Board did not commit a second breach of that provision by not fixing the Challenged Awards. The Performance Share Limitation does not create an ongoing obligation. It establishes a limitation that is tested at the time of grant. The breach of that provision had already occurred.

If the Board simply had done nothing in response to the Demand Letter, then the plaintiff could not state a reasonably conceivable claim against the directors for breach of the 2019 Plan based on their failure to take action. As discussed below, the complaint does support a claim that the Board breached its fiduciary duties by not fixing the Challenged Awards in response to the Demand Letter. The directors' unremitting fiduciary duties imposed a duty to act. The 2019 Plan did not. It therefore would not be reasonably conceivable that the directors breached the Performance Share Limitation by doing nothing.

But the directors did not do nothing. They adopted the Target Award Policy in reliance on the Interpretation Provision, and they invoked the Target Award Policy to contend that the Challenged Awards were valid. The Interpretation Provision, however, did not give the directors the authority they claimed. By adopting the Target Award Policy, the directors invoked authority that they did not possess.

It is reasonably conceivable that by adopting the Target Award Policy and attempting to use it to validate the Challenged Awards, the directors breached the 2019 Plan. That claim is different and more nuanced than the claim against the Committee for breach of the Performance Share Limitation, but it is a claim that the Complaint supports.

## B. Breach Of Fiduciary Duty

The plaintiff separately alleges that the defendants breached their fiduciary duties. The plaintiff asserts that the directors who approved the Challenged Awards breached their fiduciary duties by knowingly violating the Performance Share Limitation. The plaintiff asserts that Smith breached his fiduciary duty by accepting the Challenged Awards

51

knowing that they violated the Performance Share Limitation. And the plaintiff asserts that the directors who refused plaintiff's demand that the Company remedy the unauthorized grant of the Challenged Awards breached their fiduciary duties by failing to correct the Challenged Awards. At the pleading stage, these theories state claims on which relief can be granted.

### 1. The Attempt To Invoke The Business Judgment Rule

The defendants assert that the plaintiff has failed to state a claim for breach of fiduciary duty against any defendant because the business judgment rule protects the Committee's decisions from challenge. The defendants argue that "the Committee made two business judgments, both of which are protected by the business judgment rule." Dkt. 6 at 17. Those business judgments were (i) the decision to approve the Challenged Awards and (ii) the decision to interpret the Performance Share Limitation using the Target Award Policy. *Id.* at 18–19. The defendants maintain that the plaintiff failed to rebut the presumptions of the business judgment rule as to either decision, resulting in the plaintiff failing to plead an actionable claim. *Id.* at 17–18. This argument conflicts with two lines of established precedent.

First, the business judgment rule only applies when directors make a discretionary judgment that falls within the scope of their authority. The business judgment rule does not protect a decision that exceeds the directors' authority. Instead, allegations that the directors knowingly exceeded their authority are sufficient to state a claim that the directors breached their duty of loyalty. *Allen*, 90 A.3d at 1108 ("The possession of discretionary authority is a prerequisite for the policy-based deference of the business judgment rule.

Without authority to take the action in question, a board has no business judgment to exercise.").

As noted in the breach of contract discussion, the plain language of the Performance Share Limitation caps the maximum number of Performance Shares that can be made subject to Awards to a single participant in a single fiscal year. The business judgment rule therefore does not protect the decision to grant the Challenged Awards.

As noted in the breach of contract discussion, the plain language of the Interpretation Provision does not give the Board the authority to adopt a policy that would rewrite the Performance Share Limitation. The Board's authority under the Interpretation Provision is "[s]ubject to" the other provisions of the 2019 Plan, and the *Sanders* decision makes clear that directors cannot use a provision like the Interpretation Provision to circumvent a clear limitation in an equity compensation plan. The Interpretation Provision did not give the Board the authority to adopt the Target Award Policy in an effort to validate the Challenged Awards. The business judgment rule therefore does not protect the Board's interpretive decision.

Second, a separate line of Delaware precedent makes clear that when the allegations of a complaint support a reasonable inference that a fiduciary violated a plain and unambiguous restriction on the fiduciary's authority, then the plaintiff has asserted a claim for a breach of the duty of loyalty that rebuts the protections of the business judgment rule. The loyalty violation in that setting is the failure to act in good faith to comply with pertinent legal obligations. In the face of a plain and unambiguous restriction on the fiduciary's authority, it is reasonable to infer that the fiduciary violated the restriction

knowingly. Here, the Complaint's allegations pled a prima facie case of a fiduciary breach under this line of precedent.

For purposes of the violation of the Performance Share Limitation, this court's decision in *Pfeiffer* is squarely on point. There, the plaintiff alleged that a board of directors granted the CEO a number of options that exceeded an express cap in a stockholder-approved plan. The court explained that those allegations stated a claim for a breach of the duty of loyalty:

> In this case, [the plaintiff] has alleged sufficiently that the [b]oard clearly violated an unambiguous provision of the [p]lan. . . . [A] *prima facie* showing of such a clear violation supports an inference that the [b]oard either knowingly or deliberately exceeded its authority. Knowing or deliberate violations of a stockholder approved stock plan implicate the duty of loyalty, and breaches of the duty of loyalty cannot be exculpated by a charter provision adopted pursuant to 8 *Del. C.* § 102(b)(7).

*Pfeiffer*, 2013 WL 5988416, at *9. The court held that to the extent the business judgment rule might otherwise protect the board's decision, the allegation regarding the violation of a plain and unambiguous provision of the stockholder-approved plan was sufficient to rebut the business judgment rule. *Id.*

Other decisions stand for the same proposition. For example, in *Sanders*, this court addressed claims that a board of directors breached its fiduciary duties by "granting three of the board members, who [were] also the company's top executives, . . . . [shares that] far exceeded the number authorized by the [company's key employee stock ownership plan]." 1999 WL 1044880, at *1. As here, the stockholders in *Sanders* had approved the plan at an annual meeting, and as here, the plan's "terms [were] quite straightforward." *Id.* at *2. The *Sanders* plan limited the number of shares the committee administering the plan

could grant to 6,000,000 shares. *Id.* The committee ultimately granted 20.25 million total shares. Stockholder plaintiffs challenged the grant of the 20.25 million shares and sought, among other things, cancellation or recission of the excess shares, imposition of a constructive trust, damages, fees, and costs.

The court determined that the terms of the plan "are not susceptible to varying interpretations under any reasonable analysis that could lead to the conclusion that the board had the authority to award excess shares over the limitation found in [the plan]." *Id.* at *7. The court concluded that "the plaintiffs have sufficiently alleged facts which, taken as true, show that the [company's] board violated an express [plan] provision limiting the number of shares they were authorized to award. . . . Thus, the facts raise doubt that the board's actions resulted from a valid exercise of business judgment." *Id.* at *5; *see id.* at *1 ("By establishing a prima facie case that a board of directors awarded . . . more shares than actually authorized by a stock plan, do the plaintiffs state claims for gross negligence, waste of corporate assets and breach of fiduciary duty? Yes.").

The rulings in *Pfeiffer* and *Sanders* do not stand alone. In a series of decisions involving backdated stock options, this court held repeatedly that when directors granted options that violated an express restriction in a stockholder-approved plan, the court could infer that the directors acted in bad faith and in a manner not protected by the business judgment rule. In the seminal decision of *Ryan v. Gifford*, the defendants argued that demand was not futile because a disinterested and independent majority of the board could consider the plaintiffs' claims. 918 A.3d at 354. The court rejected that argument because the terms of the stock option plan required that the exercise of the option be not less than

55

100% of the fair market value on the date of the grant. The board had no authority to disregard that limitation, yet the allegations of the complaint supported an inference that the board had backdated nine options grants over a six-year period to make it appear that the grants took place at the lowest market price of the month or year of the grant. The court reasoned that the directors who approved the backdated options faced a substantial likelihood of liability for having knowingly violated the option plan, rendering demand futile. *Id.* at 355.

Later decisions followed *Ryan* on this point.[9] Writing while a member of this court, Chief Justice Strine characterized *Ryan* as holding that "the directors who knowingly approved or received backdated options grants faced a substantial likelihood of personal liability for breaching their fiduciary duty of loyalty." *Desimone*, 924 A.2d at 929. Later in the decision, the court described a scenario in which a

> compensation committee approved option grants to newly-hired employees, but was aware that the stockholder-approved option plan required options to

---

[9] *See London v. Tyrrell*, 2008 WL 2505435, at \*6 (Del. Ch. June 24, 2008) (holding that complaint's allegations rebutted the business judgment rule where plaintiff alleged that directors knowingly violated requirement to set strike-price for options at between 100% and 110% of the stock's fair market value as of the date of the option grant); *Weiss*, 948 A.2d at 441 ("Although the defendants are correct that compensation decisions are typically protected by the business judgment rule, the rule applies to the directors' grant of options pursuant to a stockholder-approved plan only when the terms of the plan at issue are adhered to." (footnote omitted)); *In re Tyson Foods, Inc. Consol. S'holder Litig.*, 919 A.2d 563, 593 (Del. Ch. 2007) (explaining that an otherwise disinterested and independent board acts "beyond the bounds of business judgment" if it knowingly violates a limitation in a stockholder approved compensation plan); *Conrad*, 940 A.2d at 40 (holding that allegations that directors approved backdated options in violation of restriction in plan supported inference that directors "acted knowingly" and breached their duty of loyalty by engaging in intentional wrongdoing).

56

be issued at fair market value on the date of grant. The committee realized that this was problematic because depending on market fluctuations in the stock price, employees hired in the same quarter could end up with very different incentives. Being told that "everyone was doing it," the committee decided to approve a plan of systematically backdating options so that recipients would all have a strike price set at the lowest price of the quarter in which they were hired. The committee was aware that the options were being accounted for as if they were issued on the date used to set the strike price when they in fact were not.

*Id.* at 933. Then-Vice Chancellor Strine explained that under this scenario, the directors would have

wide-open exposure to damages liability. Because the directors would have consciously taken action beyond their authority, they were, as explained in *Ryan* and *Tyson*, disloyal to the corporation. This is so even though their motives were not necessarily selfish. Although the directors may have had a reasonable business basis to provide the same incentives to all similarly situated employees, they did so using a technique (below-market options) that they had agreed not to use . . . .

*Id.*

The Performance Share Limitation is a different type of restriction, in that it imposes a cap on the size of an award rather than requiring a fair-market grant. The operative legal principle, however, is the same. It is reasonably conceivable that by granting the Challenged Awards in violation of the Performance Share Limitation, the Committee acted in bad faith.

The same reasoning applies to the Board's attempt to adopt the Target Award Policy in an effort to validate the Challenged Awards. The plain language of the Interpretation Provision did not give the Board the authority adopt the Target Award Policy. It is reasonably conceivable that by attempting to validate the Challenged Awards, the Board acted in bad faith.

57

The business judgment rule does not apply in this case. First, it does not apply because the case involves clear limitations on director authority. Second, it does not apply because it is reasonable to infer at this stage that the directors acted in bad faith by violating those clear limitations, thereby rebutting the business judgment rule.

### 2. The Claim For Breach Of Fiduciary Duty Against The Committee Members

The analysis of why the business judgment rule does not protect the Committee's decision to approve the Challenged Awards establishes that the Complaint states a claim for breach of fiduciary duty against the members of the Committee for making that decision. The allegations of the Complaint support an inference that the members of the Committee breached their duty of loyalty by failing to act in good faith because they knowingly violated the Performance Share Limitation, which was a clear limitation in the 2019 Plan. Under *Pfeiffer*, *Ryan*, *Desimone*, and other authorities, those allegations state a claim on which relief can be granted.

### 3. The Claim For Breach Of Fiduciary Duty Against The Board For Adopting The Target Award Policy

The analysis of why the business judgment rule does not protect the Board's decision to adopt the Target Award Policy establishes that the Complaint states a claim for breach of fiduciary duty against the members of the Board for taking that step and attempting to validate the Challenged Awards. The allegations of the Complaint support an inference that the members of the Board breached their duty of loyalty by failing to act in good faith because they knowingly exceeded their authority under the Interpretation

58

Provision, which was a clear limitation in the 2019 Plan. Under *Pfeiffer*, *Ryan*, *Desimone*, and other authorities, those allegations also state a claim on which relief can be granted.

### 4.    The Claim For Breach Of Fiduciary Duty Against Smith

The plaintiff next asserts that Smith breached his fiduciary duties by accepting the Challenged Awards. Under existing precedent, that theory also states a claim on which relief can be granted. The defendants did not acknowledge this theory, much less respond to it effectively.

This court's decision in *Pfeiffer* is again squarely on point. The plaintiff in *Pfeiffer* alleged that the corporation's president, Ben Leedle, had received options for more shares in a single year than the option plan permitted. The court made short work of the defendants' attempt to dismiss this claim:

> As to the breach of fiduciary duty claim, the [c]omplaint supports a reasonable inference that Leedle knew or should have known that his receipt of more than 150,000 Stock Options in a year violated the [p]lan. "Such allegations, taken as true, support an inference that [Leedle] . . . via [his] receipt of the options, breached [his] fiduciary duties."

2013 WL 5988416, at *10 (alterations in original) (quoting *Weiss*, 948 A.2d at 449).

As the *Pfeiffer* decision indicates, the *Weiss* case stands for the same proposition. In *Weiss*, company stockholders alleged that directors had approved, and officer defendants had received, "spring-loaded" and "bullet-dodged" option grants in violation of a stockholder-approved option plan. The court in *Weiss* began its analysis by explaining that the business judgment rule "applies to the directors' grant of options pursuant to a stockholder-approved plan only when the terms of the plan at issue are adhered to." 948 A.2d at 441. The court first excused demand after determining that the stockholder plaintiff

59

had "alleged particularized facts creating a reasonable doubt that the options grants resulted from a valid exercise of business judgment." *Id.* at 444. Because demand was excused, the court then denied the defendants' motion to dismiss the breach of fiduciary duty claim against the directors for approving the challenged options grants. Next, the court addressed whether the complaint stated a claim against the officer defendants and a director for "receiving the challenged grants." *Id.* at 449. The court concisely rejected the defendants' motion on this front:

> Here, the complaint alleges that these individuals knew or, absent recklessness, should have known that the grants violated the stockholder-approved option plans. Under the liberal pleading standards of this court, this knowledge may be averred generally. Such allegations, taken as true, support an inference that the [o]fficer [d]efendants and [a director], via their receipt of the options, breached their fiduciary duties.

*Id.*

Still other decisions, such as *Ryan*, support the proposition that a fiduciary breaches his duty of loyalty and faces a substantial risk of liability by knowingly receiving a stock option that violated a specific limitation in an option plan—in that case a backdated option. *See Ryan*, 918 A.2d at 356. The court in *Ryan* explained that demand was futile because four directors faced a substantial risk of liability where the plaintiff alleged that "three members of [the] board *approved* backdated options, and another board member accepted them." *Id.* Accepting the wrongfully granted options was enough. As this decision noted previously, Chief Justice Strine has characterized *Ryan* as holding that "the directors who knowingly approved *or received* backdated options grants faced a substantial likelihood of

personal liability for breaching their fiduciary duty of loyalty." *Desimone*, 924 A.2d at 929 (emphasis added).

Under these precedents, the Complaint's allegations against Smith are sufficient to state a claim on which relief can be granted. Smith is the Company's CEO. He also has been a member of the Board since 2017. The Board adopted the 2019 Plan in 2019, when Smith was a member. The Board presented the 2019 Plan to the Company's stockholders and recommended that they approve it in the Company's 2019 Proxy. In that disclosure document, the directors described the Performance Share Limitation as one of the 2019 Plan's "material terms." 2019 Proxy at 31; Compl. ¶ 32. The 2019 Proxy explained that the "2019 Plan contains annual limits on the number of shares or dollar value that can be granted as each award type to any participant, which we believe are consistent with the interests of our shareholders and sound corporate governance practices." 2019 Proxy at 28.

Given the evident importance of the Performance Share Limitation, and given his role as CEO and board member, it is reasonable to infer that Smith knew about the Performance Share Limitation. It is also reasonable to infer that he knew that the Challenged Awards violated the Performance Share Limitation. Thus, as in *Pfeiffer* and *Weiss*, the Complaint's "allegations, taken as true, support an inference that [Smith], via [his] receipt of the [Challenged Awards], breached [his] fiduciary duties."[10]

---

[10] *See Weiss*, 948 A.2d at 449. Vice Chancellor Glasscock recently addressed a stockholder plaintiff's challenge to options that the members of a compensation committee granted to themselves, other members of the board, and corporate officers. *Knight v. Miller*, 2022 WL 1233370 (Del. Ch. Apr. 27, 2022). The plaintiff challenged the grant and receipt of the options and brought claims for corporate waste, breach of fiduciary duty, and unjust

enrichment. *Id.* at *1. The issue was not whether the compensation committee had exceeded its authority pursuant to a stockholder-approved plan, but whether the compensation committee's grant of options in March 2020—when the company's stock price had bottomed out as a result of COVID-19 induced stock market turbulence—was a breach of their fiduciary duties. *Id.* at *3–5, *9. The court dismissed the plaintiff's corporate waste claim and separately found that the plaintiff had failed to allege facts supporting a reasonable inference that the compensation committee had acted in bad faith. The court engaged in a discussion of the differing standards of review applicable to the fiduciary aspect of the compensation committee's grant of options to itself, the other directors, and the officer defendants. As to the grants to directors, the court concluded that entire fairness review applied and that the plaintiff had a stated a claim for breach of fiduciary duty. *Id.* at *8–11. As to the grants to the officers, the court concluded that the business judgment rule applied and that the plaintiff therefore had not stated a claim for breach of fiduciary duty. *Id.* at *11.

The court then addressed the claim for breach of fiduciary duty against the director and officer defendants for accepting the option grants. In discussing the applicable law, the court explained that

> Delaware courts have found that actions for breach of fiduciary duty for accepting compensation can survive a motion to dismiss where (1) the compensation awarded was *ultra vires*, and the recipients knew it, or (2) where compensation was repriced advantageously in light of confidential and sensitive business information which the recipients knew, and which they accordingly used to the company's detriment.

*Id.* at *12. The court cited *Pfeiffer* as an example of when accepting compensation constituted a breach of fiduciary duty because "the compensation awarded was *ultra vires*." *Id.* The court reasoned that a plaintiff must plead bad faith to plead a breach of fiduciary duty arising from a defendant's allegedly wrongful acceptance of compensation. *Id.* Based on the facts presented, the court concluded that "there [was] an insufficient record to sustain even a claim that the [c]ompensation [c]ommittee [d]efendants making the awards acted in bad faith, much less that the recipients' acceptance violated that standard." *Id.* Accordingly, the court dismissed the fiduciary claim for accepting the awards. Finally, the court rejected the defendants' motion to dismiss the unjust enrichment claim. *Id.* at *13.

*Knight* acknowledges that a plaintiff can state a claim against defendants for accepting equity-based awards in bad faith. The *Knight* decision did not involve a violation of a clear and unambiguous limitation in a plan, and on the facts presented, the *Knight* court held that it was not reasonable to infer that the option recipients accepted them in bad faith.

**5.** **The Claim Against The Members Of The Board For Not Fixing The Challenged Awards**

Finally, assuming for the sake of argument that the Board had not adopted the Target Award Policy and sought to validate the Challenged Awards, the Complaint still would state a claim for breach of fiduciary duty against all of the members of the Board for not fixing the Challenged Awards when the plaintiff brought the issue to their attention in the Demand Letter. That theory works on the facts of this case, but it is nevertheless one that future decisions should approach with caution.

Delaware law recognizes that conscious inaction represents as much of a decision as conscious action.[11] The conscious failure to take action to address harm to the

_____

*See id.* at *12. This decision applies the same principle, but in a setting where the equity-based awards violated a clear and unambiguous limitation in the governing document.

[11] *See Aronson v. Lewis*, 473 A.2d 805, 813 (Del. 1984) ("[A] conscious decision to refrain from acting may nonetheless be a valid exercise of business judgment and enjoy the protections of the rule.") (subsequent history omitted); *In re China Agritech, Inc. S'holder Deriv. Litig.*, 2013 WL 2181514, at *23 (Del. Ch. May 23, 2013) ("The Special Committee decided not to take any action with respect to the Audit Committee's termination of two successive outside auditors and the allegations made by Ernst & Young. The conscious decision not to take action was itself a decision."); *Krieger v. Wesco Fin. Corp.*, 30 A.3d 54, 58 (Del. Ch. 2011) ("Wesco stockholders had a choice: they could make an election and select a form of consideration, or they could choose not to make an election and accept the default cash consideration."); *Hubbard v. Hollywood Park Realty Enters., Inc.*, 1991 WL 3151, at *10 (Del. Ch. Jan. 14, 1991) ("From a semantic and even legal viewpoint, 'inaction' and 'action' may be substantive equivalents, different only in form."); Jean–Paul Sartre, *Existentialism Is a Humanism* 44 (Carol Macomber trans., Yale Univ. Press 2007) ("[W]hat is impossible is not to choose. I can always choose, but I must also realize that, if I decide not to choose, that still constitutes a choice." For a discussion on *Aronson*'s subsequent history, see footnote 14, *infra.*

Vice Chancellor Slights has perfected the art of including an apt musical reference to underscore or illustrate a point. I lack his gift. He retires from the court this month, and

63

corporation animates a type of *Caremark* claim. *See South v. Baker*, 62 A.3d 1, 15 (Del. Ch. 2012). The original *Caremark* decision recognized that for a plaintiff to plead an oversight claim, the complaint must allege that the board knew or should have known about a problem and failed to correct it. *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 971 (Del. Ch. 1996) (Allen, C.). "In practice, plaintiffs often attempt to satisfy the elements of a *Caremark* claim by pleading that the board had knowledge of certain 'red flags' indicating corporate misconduct and acted in bad faith by consciously disregarding its duty to address that misconduct." *Melbourne Mun. Firefighters' Pension Tr. Fund v. Jacobs*, 2016 WL 4076369, at *8 (Del. Ch. Aug. 1, 2016), *aff'd*, 158 A.3d 449 (Del. 2017) (TABLE). The pleading of red flags supports an inference that the directors acted knowingly and in bad faith by failing to take action to address the issue, thereby breaching their duty of loyalty. *See, e.g.*, *In re Clovis Oncology, Inc. Deriv. Litig.*, 2019 WL 4850188, at *13–15 (Del. Ch. Oct. 1, 2019). For example, "[a] claim that an audit committee or board had notice of serious misconduct and simply failed to investigate . . . would survive a motion to dismiss, even if the committee or board was well constituted and was otherwise functioning." *David B. Shaev Profit Sharing Acct. v. Armstrong*, 2006 WL 391931, at *5 (Del. Ch. Feb. 13, 2006) (footnote omitted), *aff'd*, 911 A.2d 802 (Del. 2006) (TABLE).

---

all of us will miss a truly exemplary colleague and friend. In his honor, I supplement my typically staid list of citations with the following: "You can choose a ready guide in some celestial voice. If you choose not to decide, you still have made a choice." Rush, *Freewill*, *on* Permanent Waves (Moon Recs. 1980) (lyrics written by Neil Peart).

64

As this decision has explained, settled precedent establishes that a decision-maker acts disloyally and in bad faith by consciously disregarding a limitation in an equity compensation plan. Because conscious inaction is functionally the same as action, it follows that a conscious decision to leave a violative award in place supports a similar inference that the decision-maker acted disloyally and in bad faith.

That is what the plaintiff asserts here. The Complaint alleges that the Demand Letter put the directors on notice that the Challenged Awards violated the unambiguous language of the 2019 Plan. The Complaint alleges that the directors refused to correct the situation. The plaintiff alleges that the knowing failure to take action to correct the Challenged Awards constituted a breach of fiduciary duty. *See* Compl. ¶ 73 ("The Demand Board Defendants breached their fiduciary duties by refusing to correct the situation upon being provided with an opportunity to do so through the [Demand Letter].").

For purposes of this claim, it matters that the contractual counterparties on both sides of the Challenged Awards—the Company and Smith—had a fiduciary duty to fix the violation. Envision a hypothetical in which the Committee had granted the options to a third-party consultant (permitted by the 2019 Plan). Further assume (to make the hypothetical cleaner) that the recipient had no reason to know about the Performance Share Limitation and was a blameless recipient of the grant. Under that setting, if the Board learned later about the violation, then the Board would not have an easy fix available. The consultant would not plainly have a fiduciary duty to fix the grant, and the Board would face a tough decision. The alternatives could range from doing nothing to asserting some form of claim against the consultant. In that setting, the decision to address the problem

would be a business judgment, and in exercising discretion over what action to take, the Board could take into account a number of factors, including the effect on the Company's relationships with third parties if the Company did not bear the responsibility for the errant grant. The Board might reason that letting the issue go would be better for the Company in the long run. This court has acknowledged similar considerations when a Board has faced a decision over whether to invoke an arguably strong basis for a for-cause termination against a senior executive.[12]

In that hypothetical, any effort by the plaintiff to assert a claim based on the board's allegedly wrongful refusal of the plaintiff's demand would founder on the rocks of the business judgment rule. A plaintiff would not have a viable claim based on a non-grossly negligent or otherwise exculpated decision made by disinterested and independent directors. But the hypothetical generates that result not because the decision to address the demand is a decision to which fiduciary liability never could attach, but rather because of

---

[12] *See, e.g.*, *Espinoza v. Hewlett-Packard Co.*, 32 A.3d 365, 368–69, 373 (Del. 2011) (affirming denial of request to inspect books and records to investigate allegedly wrongful failure to terminate CEO for cause because the company had "provided some explanation of why the [b]oard did not fire [the executive] 'for cause,'" and therefore the stockholder had made "no showing that the undisclosed details in the [withheld internal report] address[ed] the [b]oard's negotiating position" in executing a severance agreement with the executive); *Zucker v. Andreessen*, 2012 WL 2366448, at *8–10 (Del. Ch. June 21, 2012) (dismissing complaint challenging termination without cause as a breach of fiduciary duty; explaining that "[a]lthough the [b]oard *could* have elected to pay [the executive] nothing, determining whether it *should* have done so, or whether making the deal it did constitutes waste, involves a broader legal analysis" and concluding that the board could properly consider the "costs of time, resources, and negative publicity" in deciding whether to invoke a for-cause termination).

the applicable standard of review. If there were grounds to rebut the business judgment rule, the outcome would be different.[13]

Here, the facts are different. The clear answer was to fix the Challenged Awards, and the failure to take that action supports an inference of bad faith conduct. A fix was readily available because Smith himself was a director and he therefore had the same fiduciary-fueled obligation to remedy the problem as his fellow directors.

Notwithstanding the doctrinal analysis, this outcome gives me pause. In this case, the stockholder plaintiff put the Board on notice of the problem by sending the Demand Letter. There are sound policy reasons to resist permitting a stockholder plaintiff to create a new claim by sending a demand letter. A plaintiff might send a demand letter strategically for any number of reasons, two of which come to mind. Envision a claim where the limitations period for challenging the original wrong was drawing to a close. A plaintiff might send a letter identifying the original wrong and demanding that the board fix it, then attempt to take advantage of that new claim to support a timely filing. I suspect that the members of this court will be able to see through an artifice of that sort when applying the doctrine of laches, but it still presents concern.

Another potential strategy would be to bring a different or deeper-pocketed defendant into the target zone. Assume, as here, that a subset of the directors made the

---

[13] In the hypothetical, the directors who approved the original grant still would face a claim for exceeding a clear and unambiguous limitation on their authority. The challenge to the subsequent decision about what to do to fix the problem—even if the decision was to do nothing—would not state a claim on which relief could be granted.

original decision, but the plaintiff sees an advantage in filing a lawsuit that could name other members of the board. By sending a letter identifying the problem and demanding that the board fix it, the plaintiff could bring additional defendants into the mix.

The making of a demand has an established role under Rule 23.1. As the Delaware Supreme Court has explained, "if demand is excused or wrongfully refused, the stockholder will normally control the proceedings." *Brehm v. Eisner*, 746 A.2d 244, 255 (Del. 2000). The making of demand has not historically given rise to a new cause of action. Indeed, in a footnote, this court once observed in passing that "[w]rongful refusal is not an independent cause of action." *Baron v. Siff*, 1997 WL 666973, at *1 n.4 (Del. Ch. Oct. 17, 1997).

It is worth asking *why* this is so. The answer is the tacit-concession doctrine that the Delaware Supreme Court announced in *Spiegel v. Buntrock*, 571 A.2d 767, 772–73 (Del. 1990). Under that doctrine, a stockholder who makes demand tacitly concedes that the board was disinterested and independent for purposes of responding to the demand. As a result, the board's decision regarding the demand generally receives the protection of the business judgment rule. *See Solak v. Welch*, 2019 WL 5588877, at *3 (Del. Ch. Oct. 30, 2019), *aff'd*, 228 A.3d 690 (Del. 2020) (TABLE).

The tacit-concession doctrine generally prevents the making of a demand from giving rise to a follow-on claim. Instead, the principal function of making demand has been to affect who controls the derivative suit.

But the tacit-concession doctrine will not always result in the business judgment rule protecting the board's decision. Chancellor McCormick's decision in *City of Tamarac*

68

*Firefighters' Pension Trust Fund v. Corvi* illustrates how that could occur. *See* 2019 WL

549938 (Del. Ch. Feb. 12, 2019). The plaintiff in *Corvi* alleged that the members of a board

of directors acted wrongfully by rejecting a demand in reliance on the report and

recommendation of a conflicted committee. *Id.* at *6. The defendants argued that *Spiegel*'s

tacit-concession doctrine extended to the committee, but Chancellor McCormick explained

that two post-*Spiegel* decisions—*Grimes v. Donald*, 673 A.2d 1207 (Del. 1996), and

*Scattered Corporation v. Chicago Stock Exchange, Inc.*, 701 A.2d 70 (Del. 1997)[14]—

circumscribed the *Spiegel* rule. After those later decisions, the tacit-concession doctrine

means that "the plaintiff accepts that the number of board members necessary to carry a

vote, typically a majority, lacks conflicts with respect to the demand." *Corvi*, 2019 WL

549938, at *8. "The tacit concession doctrine does not go further and prevent a court from

considering obvious conflicts or bias when evaluating a board's decision to delegate the

demand-review process to a committee." *Id.* It also does not prevent a court from

---

[14] In *Beam*, the Delaware Supreme Court overruled seven precedents (including *Grimes* and *Scattered*) to the extent they had reviewed a Rule 23.1 decision by the Court of Chancery under an abuse of discretion standard or otherwise suggested deferential appellate review. *Beam*, 746 A.2d 253 & n.23 (overruling in part on this issue *Scattered*, 701 A.2d at 72–73; *Grimes*, 673 A.2d at 1217 n.15 (Del. 1996); *Heineman v. Datapoint Corp.*, 611 A.2d 950, 952 (Del. 1992); *Levine v. Smith*, 591 A.2d 194, 207 (Del. 1991); *Grobow v. Perot*, 539 A.2d 180, 186 (Del.1988); *Pogostin v. Rice*, 480 A.2d 619, 624–25 (Del. 1984); and *Aronson*, 471 A.2d at 814). The *Brehm* Court held that going forward, appellate review of a Rule 23.1 determination would be de novo and plenary. *Brehm*, 746 A.2d at 253–54. This decision does not rely on any of the partially overruled precedents for the standard of appellate review, and it therefore omits the reference to their subsequent reversal on other grounds by *Brehm*. This decision also does not rely on *Aronson* for any aspect of its test for demand futility, which the Delaware Supreme Court reformulated in *United Food & Commercial Workers Union v. Zuckerberg*, 262 A.3d 1034 (Del. 2021).

considering whether the directors acted in good faith when considering a litigation demand. "To show bad faith, a plaintiff must plead with particularity that the [b]oard intentionally acted in disregard of the [c]ompany's best interest in deciding not to pursue the litigation the [p]laintiff demanded." *Id.* at *10 (cleaned up). That is a high standard, but *Corvi* recognized that a plaintiff could overcome the tacit-concession doctrine by pleading facts demonstrating that a board acted in bad faith. *Id.* at *8.

In *Corvi*, the plaintiff did not plead sufficient facts to support an inference of wrongful refusal, and the Chancellor therefore dismissed the claim. *Id.* at *12. But if the Chancellor had found that the directors acted in bad faith in refusing the demand, it would not require any additional analysis to infer that the directors breached their duty of loyalty by acting in bad faith and hence that the wrongful decision to refuse the demand supported a claim for breach of fiduciary duty.

The plaintiff in this case alleges that the directors knowingly failed to fix an obvious violation of a clear restriction in a stockholder-approved plan. Those allegations support an inference that all of the directors (including Smith) acted in bad faith and hence that they breached their fiduciary duties in rejecting the Demand Letter. This case is therefore one of the (likely rare) scenarios in which a plaintiff will be able to assert a viable breach of fiduciary duty claim based on the rejection of a demand letter.[15]

---

[15] Of course, stating a claim is only the first step. There are other difficulties for the plaintiff to overcome. Most notably, the extent of any damages will be debatable. The Delaware Supreme Court has made clear, however, that reliance damages, such as some quantum of the expense that the corporation was forced to bear, can be available even if

The outcome remains uncomfortable. It would be easier to analyze the claim if the notification came from a whistleblower, or if there were red flags internal to the corporation that put the directors on notice and resulted in their failure to act. From an analytical perspective, however, the source of the director's knowledge should not make a difference. The breach lies in their conscious failure to act based on the knowledge that they possessed.

The claim against the directors for failing to fix the Challenged Awards in response to the Demand Letter therefore survives pleading-stage review. It is a novel claim, but "novelty is not necessarily a fatal quality." *SDF Funding LLC v. Fry*, 2021 WL 4519599, at *4 (Del. Ch. Oct. 4, 2021). "It is not the dictate . . . of sound reasoning to reject a proposition as untrue upon its first announcement, and for the reason, solely, that it has never been heard of before. Such a determination would necessarily lead to the rejection of all propositions, however correct and demonstrable; for all propositions have had a first announcement." *Fox v. Wharton*, 5 Del. Ch. 200, 210 (1878). The common law develops on a case-by-case basis, and future decisions should provide opportunities to refine the extent to which a plaintiff can sue based on action that directors take or consciously fail to take in response to a demand.

## C. Unjust Enrichment.

In the Complaint's final count, the plaintiff advances a claim for unjust enrichment against Smith for the "personal financial benefit" he received "as a result of the excess

---

transactional damages are not. *See Thorpe by Castleman v. CERBCO, Inc.*, 676 A.2d 436, 444 (Del. 1996).

Performance Share Awards." Compl. ¶ 77. This count states a claim on which relief can be granted.

As a threshold matter, it is important to emphasize that unjust enrichment can operate either as a cause of action or as a remedy. Put in more scholarly terms, "[u]njust enrichment has both a substantive and a remedial aspect." Dan B. Dobbs, *Law of Remedies: Damages—Equity—Restitution* § 4.1(1), at 366 (2d ed. 1993). "The substantive question is whether the plaintiff has a right at all, that is, whether defendant is unjustly enriched by legal standards." *Id.* That question is distinct from the remedial aspect, which is "concerned first with whether, among the remedies possible, restitution is an appropriate or the most appropriate choice . . . .[and] [s]econd . . . with the appropriate measure or form of restitution." *Id.*; *see* Eric J. Konopka, Note, *Hey, That's Cheating! The Misuse of the Irreparable Injury Rule as a Shortcut to Preclude Unjust-Enrichment Claims*, 114 Colum. L. Rev. 2045, 2054 (2015).

The defendants seek to dismiss the plaintiff's effort to plead unjust enrichment as a claim. It remains possible that even if the court dismissed the substantive claim for unjust enrichment, the court still could award a restitutionary remedy that could be described as a remedy for unjust enrichment. *See Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213–14 (2002) (explaining the availability of restitution as a remedy); *accord Reich v. Cont'l Cas. Co.*, 33 F.3d 754, 756 (7th Cir. 1994) (Posner, J.).

Under the standard Delaware formulation of the elements of a claim for unjust enrichment, a plaintiff must plead and later prove "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the

72

absence of justification, and (5) the absence of a remedy provided by law." *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010). In seeking to dismiss the claim, Smith asserted boldly that the plaintiffs failed to allege "any element of a claim for unjust enrichment." Dkt. 6 at 22. His arguments failed to sustain that confident contention.

### 1. An Enrichment

The first element of a claim for unjust enrichment is, not surprisingly, an enrichment. The Complaint easily pleads this element. Smith currently possesses the Challenged Awards. That is an enrichment.

The defendants respond that Smith has "not yet received any enrichment" because it is impossible as yet to know what value Smith will receive. *See* Dkt. 6 at 20–21; Dkt. 13 at 17. Once again, the defendants' argument contravenes the plain language of their own documents. It also contravenes settled authority.

The 2019 Plan recognizes the fact that the Challenged Awards had value at the time of their grant, despite the uncertainty about the value the shares would have upon receipt. The 2019 Plan even provides a metric for measuring the initial value of a Performance Share Award: "Each Performance Share shall have an initial value equal to the Fair Market Value of a share of Common Stock on the date of grant." 2019 Plan § 8.3. The 2019 Plan defines the Fair Market Value of a share of the Company's common stock as the "closing sale price of a share of Common Stock on such date." *Id.* Art. 2 at A-3.

That formula makes it a simple matter to calculate the initial value of the Challenged Awards. There were 4,733,840 shares that were subject to the grants. The date of the grant was March 10, 2020. The closing price of a share of the Company's common stock on that

73

date was $20.30.[16] Using the metric that the 2019 Plan specifies, the Challenged Awards had a grant-date value of $96,096,952. It is reasonable to infer at the pleading stage that Smith was enriched by that amount.

The Company's disclosures also ascribe values to the Challenged Grants, although significantly lower values than the formula in the 2019 Plan. The 2021 Proxy contains a table identifying the Challenged Grants. Under the column labeled "Grant Date Fair Value," the 2021 Proxy identifies $2,250,000 as the value of each of the Challenged Grants, albeit after the 1-for-10 reverse split. 2021 Proxy at 72. A footnote explains that this is computed "in accordance with FASB ASC Topic 718 for stock-based compensation." *Id.* at 72 n.4. The 2021 proxy also directs the reader to Notes 1 and 14 of the consolidated financial statements in the 2020 annual report and explains that "these amounts do not correspond to the actual value that will be recognized as income by each of the [named executive officers] when received." *Id.*; *see* ODP Corporation, Annual Report (Form 10-K) 60–66, 88–89 (Feb. 26, 2020). As an alternative measure of enrichment, it is reasonable to infer at the pleading stage that Smith has been enriched by that amount.

Just as their contention that Smith has not yet been enriched to any degree fails to come to grips with the 2019 Plan, the defendants' position also—once again—flies in the face of precedent. This court has rejected similar arguments where plaintiffs bring an unjust enrichment claim against individuals with unexercised options. In *Ryan*, this court rejected

---

[16] *ODP Historical Data*, NASDAQ, https://www.nasdaq.com/market-activity/stocks/odp/historical.

the argument that a recipient of backdated stock options had not received any benefit because the plaintiff had not alleged that the recipient had exercised the options. 918 A.2d at 361. Describing that assertion as "contrary both to the normal concept of remuneration and to common sense," the court explained that the recipient "does retain something of value, the alleged backdated option, at the expense of the corporation and its stockholders." *Id.* The court recognized that the option had contingent value, because "one can imagine a situation where [the defendant] exercises the options and benefits from the low exercise price." *Id.* The court added that "even if [the defendant] fails to exercise a single option during the course of this litigation, that fact would not justify dismissal of the unjust enrichment claim." *Id.*

In *Weiss*, the court rejected a variant of the same argument, relying on *Ryan. Weiss*, 948 A.2d at 449. The court explained that the fact that the options had not been exercised "does not lead to a conclusion that there is no reasonably conceivable set of circumstances under which the defendants might be unjustly enriched." *Id.* at 449–50. Instead, the defendants "retain[ed] something of value—the challenged options—at the expense of the corporation." *Id*. at 450.

Here, Smith currently possesses the right to receive shares under the Challenged Grants. That right has value. As in the precedent cases, it is also reasonably conceivable that the right will become exercisable. It is reasonably conceivable that Smith has been enriched.

## 2.     An Impoverishment

As framed under Delaware law, the second element of an unjust enrichment claim is an impoverishment. The Complaint pleads facts making it reasonably conceivable that the Company has been impoverished. The Challenged Awards give Smith rights against the Company. As discussed in the prior section, those rights have value. As the counterparty under the Challenged Awards, those rights come at the expense of the Company.

In yet another version of their "we don't know yet" argument, the defendants maintain that no impoverishment could have taken place until the number of shares or equivalent value that Smith will receive is known. Dkt. 6 at 20–21. The defendants cannot perceive how the Company's rights could have been interfered with before it transfers any shares of stock to Smith or makes any payment to him. Dkt. 13 at 17.

Presumably the defendants would not be so flummoxed by the effects of the Company entering into a promissory note (or guaranteeing one). The fact that the Company had not yet paid any money on the obligation would not negate the existence of the obligation, which would have a straightforward impact on the Company's financial statements. For purposes of understanding the impoverishment, there is no difference between the Company's obligation to repay money under a note and the Company's obligation to issue shares under the Challenged Awards.

Once again, the cases addressing unexercised options defeat the defendants' argument. As explained in both *Weiss* and *Ryan*, the unexercised options constituted "something of value" that the defendants received "at the expense of the corporation and

shareholders." *Ryan*, 918 A.2d at 361; *accord Weiss*, 948 A.2d at 450. The same is true here. The Challenged Awards bind the Company to provide consideration to Smith. That is an invasion of the Company's rights to the shares. The second element is satisfied.

Although not critical to this case, blackletter sources recognize that there are situations where a plaintiff need not plead a distinct impoverishment to support a claim for unjust enrichment. The Restatement (Third) of Restitution and Unjust Enrichment provides that "[a] person who is unjustly enriched at the expense of another is subject to liability in restitution." Restatement (Third) of Restitution and Unjust Enrichment § 1 (Am. L. Inst.), Westlaw (database updated Mar. 2022) [hereinafter Restatement of Unjust Enrichment]. But the Restatement of Unjust Enrichment explains that

> [w]hile the paradigm case of unjust enrichment is one in which the benefit on one side of the transaction corresponds to an observable loss on the other, the consecrated formula 'at the expense of another' can also mean 'in violation of the other's legally protected rights,' without the need to show that the claimant has suffered a loss.

*Id.* cmt. a.

In a later section, the Restatement of Unjust Enrichment amplifies these points by emphasizing that "[a] person is not permitted to profit by his own wrong." *Id.* § 3. In the Reporter's Note to that section, the Restatement of Unjust Enrichment explains that an earlier version of the Restatement tacked the words "at the expense of another" onto the statement that "[a] person is not permitted to profit by his own wrong." *Id.* (citing Restatement (First) of Restitution § 3 (Am. L. Inst. 1937), Westlaw (database updated Mar. 2022) ("A person is not permitted to profit by his own wrong at the expense of another.")).

The current edition of the Restatement of Unjust Enrichment intentionally omitted that phrase:

> The purpose of this change is to avoid any implication that the defendant's wrongful gain must correspond to a loss on the part of the plaintiff. . . . On the contrary, it is clear not only that there can be restitution of wrongful gain exceeding the plaintiff's loss, but that there can be restitution of wrongful gain in cases where the plaintiff has suffered an interference with protected interests but no measurable loss whatsoever.[17]

Permitting restitution even where the plaintiff has "no measurable loss whatsoever" is consistent with the principles underlying the concept of unjust enrichment. As one textbook explains, "The basic purpose of the result reached in these cases is to prevent the defendant from being unjustly enriched. Hence, the restitutionary recovery is not, as in damages, the *harm* to the plaintiff, but rather the *benefit* received by the defendant."[18]

---

[17] *Id.* reporter's note a; *see Merrimon v. Unum Life Ins. Co. of. Am.*, 758 F.3d 46, 53 (1st Cir. 2014) (citing Restatement of Unjust Enrichment, *supra*, § 3 to support the finding that plaintiffs had constitutional standing because "plaintiffs ma[de] a colorable claim[]. . . . that the insurer has wrongfully retained and misused their assets. . . ., [which] [i]f proven . . . would constitute a tangible harm even if no economic loss results"); *Edmonson v. Lincoln Nat'l Life Ins. Co.*, 725 F.3d 406, 415 (3d Cir. 2013) (holding that plaintiffs had standing because their claim was for disgorgement, a remedy in restitution, and that there was no requirement "that a plaintiff suffer a financial loss, as relief in a disgorgement claim is measured by the defendant's profits" and the "nature of disgorgement claims suggest that a financial loss is not required for standing, as loss is not an element of a disgorgement claim" (cleaned up)).

[18] Edward D. Re & Joseph R. Re, *Remedies: Cases and Materials* 650 (5th ed. 2000); *see* Dan B. Dobbs, *Remedies: Damages—Equity—Restitution* § 4:1, at 224 (1st ed. 1973) ("The principle, once again, is to deprive the defendant of benefits that in equity and good conscience he ought not to keep, even though he may have received those benefits quite honestly in the first instance, and even though the plaintiff may have suffered no demonstrable losses."). Another scholar elaborates on these ideas:

Although the standard Delaware formulation frames the doctrine of unjust enrichment as requiring an impoverishment, the Delaware Supreme Court has recognized that unjust enrichment is more flexible. *See Fleer Corp. v. Topps Chewing Gum, Inc*, 539 A.2d 1060 (Del. 1988). In the *Fleer* case, both Fleer Corporation and Topps Chewing Gum, Inc. manufactured baseball trading cards. Topps had an exclusive agreement with the Major League Baseball Players Association to manufacture cards with Major League players. Fleer filed suit against Topps and obtained an order from a federal district court invalidating Topps exclusive agreement on antitrust grounds. The order meant that Fleer could manufacture Major League Baseball cards. But after the court of appeals reversed, Topps regained its exclusive rights.

Relying on a theory of unjust enrichment, Topps sued in this court to obtain an accounting of the profits that Fleer generated while the district court's order was in effect.

---

> The conception of unjust enrichment as ordinarily defined includes not only a gain on one side but loss on the other, with a tie of causation between them. This conception has been phrased in various ways—"enrichment at the expense of another," "gain through another's loss," or in Keener's phrase (used in connection with liability in quasi-contract) that there must be "not only a plus, but a minus quantity." Actually these components, appearing in an immense variety of situations, are highly variable both in their own content and in their interconnections. The "loss" need not involve any physical diminution or subtraction from the assets of the complaining party; the requirement of loss can be satisfied if a legal protected interest is invaded—*e.g.*, the right of an owner to exclusive use of chattel.

John P. Dawson, *Restitution or Damages?* 20 Ohio State L. Rev. 175, 176 (1959) (footnote omitted); *see id.* at 190 ("In fixing the outer limits of quasi-contract restitution the key word, again, is 'benefit' and its meaning, again, is shaped by the context.").

*Id.* at 1061. Fleer moved for summary judgment, contending that Topps had not been impoverished because Topps had no right to enforce its contract rights during the period in question. Both this court and the Delaware Supreme Court rejected Fleer's argument. In the section of the analysis pertinent to this case, the Delaware Supreme Court framed unjust enrichment as "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Id.* at 1062 (cleaned up). En route to finding that restitution was available, the Delaware Supreme Court explained that the remedy of restitution could be invoked "even though [the defendant] may have received those benefits honestly in the first instance, and even though the plaintiff may have suffered no demonstrable losses." *Id.* at 1063 (cleaned up); *accord Schock v. Nash*, 732 A.2d 217, 232–33 (Del. 1999) (quoting *Fleer* for the proposition that restitution is available as a remedy for unjust enrichment "even though the plaintiff may have suffered no demonstrable losses" (cleaned up)).

Based on these authorities, this court has cautioned that "the emphasis on 'impoverishment' is not entirely warranted because restitution may be awarded based solely on the benefit conferred upon the defendant, even in the absence of an impoverishment suffered by the plaintiff." *MetCap Sec. LLC v. Pearl Senior Care, Inc.*, 2009 WL 513756, at *5 n.26 (Del. Ch. Feb. 27, 2009), *aff'd*, 977 A.2d 889 (Del. 2009) (TABLE); *see Schaeffer v. Lockwood*, 2021 WL 5579050, at *20 n.269 (Del. Ch. Nov. 30, 2021). A leading treatise has observed that to interpret the cases as imposing an invariable requirement to plead and prove impoverishment "would appear to be inconsistent with precedent." 2 Donald J. Wolfe & Michael A. Pittenger, *Corporate and Commercial*

*Practice in the Delaware Court of Chancery* § 16.01[b], at 16-19 n.85 (2d. ed. 2021 & Supp.).

Although practitioners regularly cite *Nemec* for the requirement that a plaintiff plead and prove an impoverishment, that decision acknowledges that "'[i]mpoverishment' does not require that the plaintiff seeking a restitutionary remedy suffer an actual financial loss, as distinguished from being deprived of the benefit unjustifiably conferred upon the defendant." 991 A.2d at 1130 n.37. Even under *Nemec*'s formulation of the elements, a plaintiff need not plead a personal "impoverishment" in the sense of a pecuniary loss. Rather, a plaintiff must plead that the defendant received a *benefit*, that the defendant's receipt of the benefit was unjustified, and that there is some connection between the benefit unjustly received and an invasion of the plaintiff's legally protected rights. The claim is about unjust *enrichment*, not the plaintiff's impoverishment. *See* Restatement of Unjust Enrichment, *supra*, § 1 cmt. a ("[T]he consecrated formula 'at the expense of another' can also mean 'in violation of the other's legally protected rights,' without the need to show that the claimant has suffered a loss."). Often, a plaintiff bringing an unjust enrichment claim will have suffered an impoverishment, but the general framing need not imply that a plaintiff must plead and prove an impoverishment.

Here, the plaintiff has proved that the Company has been impoverished. But even if that were not so, the plaintiff has alleged sufficiently that Smith received an unjustified benefit that bears a sufficient relation to the Company's rights.

81

### 3.     A Relationship Between The Impoverishment And The Enrichment

Under the third element of the claim as traditionally framed under Delaware law, there must be a relation between the impoverishment and the enrichment. This case involves a direct linkage, because the rights that Smith gains against the Company come at the expense of the Company. Despite boldly claiming that the plaintiff failed "to allege any element of a claim for unjust enrichment," Smith did not contest this element.

For the reasons stated in the prior section, a better way to frame the second and third elements is to combine them into a requirement that plaintiff plead and later prove a relationship between the challenged enrichment and an invasion of the plaintiff's protected interests. As discussed, an impoverishment is not strictly necessary, and a relationship between the impoverishment and the enrichment is thus also not strictly necessary.

### 4.     The Absence Of Justification

Under the fourth element of the claim as traditionally framed under Delaware law, there must be "absence of justification" for the benefit. Dkt. 6 at 21; *accord* Dkt. 13 at 17. The Complaint plainly pleads an absence of justification. It asserts that in light of the Performance Share Limitation, Smith should not have received the Challenged Awards.

The defendants argue in response that the plaintiff has not challenged Smith's compensation as "excessive," and they assert that the plaintiff "does nothing to explain how fairly earned compensation" can satisfy the "absence of justification" element. Dkt. 13 at 17. That argument ignores the thrust of the Complaint. The plaintiff is not asserting that Smith's compensation is excessive in the abstract. Nor are they contending that the magnitude of Smith's compensation is so great as to constitute waste. The plaintiff asserts

that Smith has received an unjustified benefit because the Challenged Awards exceed the Performance Share Limitation. *See* Dkt. 10 at 23. Based on the well-pled facts in the Complaint, it is reasonably conceivable that there was no justification for the Committee's decision to make grants to Smith that exceeded the Performance Share Limitation. It is thus reasonably conceivable that Smith's receipt of the Challenged Awards was unjustified.

### 5. The Absence Of A Remedy At Law

The only element of the claim as traditionally framed where the defendants have any leg to stand on is the need to plead the absence of a remedy provided by law. The defendants see this argument as a clean winner. The plaintiff has alleged claims for breach of contract and breach of fiduciary duty, so the plaintiff must concede that adequate remedies exist. Indeed, under that reasoning, any plaintiff who pleads a cause of action in addition to unjust enrichment has hoisted itself on its own petard. Only an unadorned complaint asserting a single claim for unjust enrichment would have any chance of success.

The flaw in Smith's argument lies in the simplistic approach it takes to the role that "the absence of a remedy provided by law" plays in an unjust enrichment claim. The Restatement of Unjust Enrichment explains that including that element as an essential component of any claim for unjust enrichment is "simply wrong," a "[p]ersistent error[]," and a "spurious proposition." Restatement of Unjust Enrichment, *supra*, § 4 cmts. c, e. The Restatement of Unjust Enrichment plainly states that "[a] claimant otherwise entitled to a remedy for unjust enrichment, including a remedy originating in equity, need not demonstrate the inadequacy of available remedies at law." *Id.* § 4(2).

83

The Restatement of Unjust Enrichment is not alone in making this point. A treatise writer agrees:

> Restitution is frequently sought where the plaintiff has another remedy, for example an action to recover damages for tort or breach of contract. The availability of restitution is not dependent upon inadequacy of the alternative remedy. This is a historic limitation on the assertion of equity jurisdiction which must be taken into account when restitution is sought in equity, but there is no independent principle that confines restitution to cases in which alternative remedies are inadequate.

1 George E. Palmer, *Law of Restitution* § 1.6, at 33–34 (1978 & 2016 Supp.).

As the treatise explains, the inquiry into whether an adequate remedy exists at law derives from the need to evaluate whether jurisdiction exists in equity. A court of equity is a court of limited jurisdiction, and one source of equitable jurisdiction arises when an equitable remedy is called for because of the absence of an adequate remedy at law. *See Nat'l Indus. Grp. (Hldg.) v. Carlyle Inv. Mgmt. L.L.C.*, 67 A.3d 373, 382 (Del. 2013) ("It is well-established that the Court of Chancery has subject matter jurisdiction where (among other things) a party: 1) seeks an equitable remedy, such as specific performance or an injunction, and 2) lacks an adequate remedy at law."). Put conversely, a court of equity lacks jurisdiction over a matter where the courts of law exercise concurrent jurisdiction if the remedy at law is adequate. *See* 10 *Del. C.* § 342 ("The Court of Chancery shall not have jurisdiction to determine any matter wherein sufficient remedy may be had by common law, or statute, before any other court or jurisdiction of this State.").

A whirlwind historical tour reveals how a concept tied to equitable jurisdiction seeped into the law of unjust enrichment. The early English common law courts developed the concept of unjust enrichment by applying the form of action known as *indebitatus*

84

*assumpsit*, Latin for "to have undertaken a debt." W.M.C. Gummow, Moses v. Macferlan

*250 Years On*, 68 Wash. & Lee L. Rev. 881, 883 (2011) (quoting Michael Lobban,

*Contract*, *in* 12 The Oxford History of the Laws of England 295, 564 (Sir John Baker ed.,

2010)). In 1760, Lord Mansfield issued the decision that has been recognized as

establishing the foundation for unjust enrichment. *Moses v. Macferlan* (1760) 97 Eng. Rep.

676 (K.B); 2 Burr 1005. He issued the decision as a member of the King's Bench, a

common law court, and he applied principles of restitution, which were and remain an

acknowledged part of the common law.[19]

Nineteenth century American cases correctly recognized that a plaintiff could

maintain a claim for unjust enrichment at common law using the form of action known as

*indebitatus assumpsit*.[20] During the same period, American courts recognized that a court

---

[19] *See* Steve Hedley, *Unjust Enrichment*, 54 Cambridge L.J. 578, 578 (1995) ("Restitution has always been part of the common law."); Andrew W. Kull, *James Barr Ames and the Early Modern History of Unjust Enrichment*, 25 Oxford J. Leg. Studs. 297, 302 (2005) (explaining that "the common law incorporates a broad principle of liability based on unjust enrichment" and that the "*legal* side of restitution" is the "part that originated in the action of implied assumpsit"); *see also* James Barr Ames, *Implied Assumpsit*, *in* Lectures on Legal History and Miscellaneous Legal Essays, 149, 162–64, 166 (1913) (chronicling the evolution of what would become unjust enrichment in the common law courts and concluding that assumpsit "competed with equity in the case of the essentially equitable quasi-contracts growing out of the principle of unjust enrichment").

[20] *See Dermott v. Jones*, 64 U.S. (23 How.) 220, 233–34 (1859) (recognizing that "the law now in England and in the United States" is that where one "party has derived any benefit from the labor done," even if the work was not done "in strict accordance with [a] contract," "it would be unjust to allow him to retain that [benefit] without paying anything" and that "an action of indebitatus assumpsit is maintainable"); *Northrop's Ex'rs v. Graves*, 19 Conn. 548, 554 (1849) ("[W]hen money is paid by one, under a mistake of his rights and his duty, and which he was under no legal or moral obligation to pay, and which the

of equity also could entertain a claim for unjust enrichment. The catalyst was *Bright v. Boyd*, 4 F. Cas. 127 (C.C.D. Me. 1841) (No. 1,875), where "Justice Story saw himself as expanding a common law concept into courts of equity." *Intellectual History*, *supra*, at 2085–86. In *Bright*, "a purchaser, bona fide and for a valuable consideration," improved property and "greatly enhanced its value," but unknowingly possessed a defective title. 4 F. Cas. at 132. Citing "the general principles of courts of equity," Justice Story explained that

> compensation, under such circumstances, ought to be allowed to the full amount of the enhanced value, upon the maxim of the common law, "*nemo debet locupletari ex alterius incommode*" [no one should be enriched by another's misfortune]; or, as it is still more exactly expressed in the Digest, "*jure naturae aequum est, neminem cum alterius detrimento et injuria fieri locupletiorem*" [by the law of nature it is fair that no one with the detriment and injury of another should be made richer].

*Id.* at 133 (emphasis added). Justice Story noted, however, that "the doctrine has not as yet been carried to such an extent in our courts of equity." *Id.* Instead, he cited a number of prominent civil law sources to support the claim. *Id.*; *see Intellectual History*, *supra*, at 2085–86 (collecting additional cases).

After the *Bright* decision, courts of equity entertained claims for unjust enrichment.[21] But because unjust enrichment did not arise in equity and was not a purely

---

recipient has no right in good conscience to retain, it may be recovered back, in an action of *indebitatus assumpsit*."); *The Intellectual History of Unjust Enrichment*, 133 Harv. L. Rev. 2077, 2084–85 & n. 71 (2020) [hereinafter *Intellectual History*] (collecting cases).

[21] *See generally Intellectual History*, *supra*, at 2081 ("Unjust enrichment was a creature of both common law and equity"); Kull, *supra*, at 306 ("In the pages of the Harvard Law Review, therefore, and presumably in the lecture room, both Ames and Keener were

equitable claim, a party that sought to assert a claim for unjust enrichment in a court of equity needed to identify a basis for the assertion of equitable jurisdiction. *See* Douglas Laycock, *The Death of the Irreparable Injury Rule*, 103 Harv. L. Rev. 687, 689 (1990). The principle basis was to assert that the plaintiff lacked an adequate remedy at law. *Id.* By contrast, in a case where equitable jurisdiction otherwise existed, there is no need for a plaintiff to plead this element.

Delaware authorities acknowledge these principles.[22] Nevertheless, many decisions have "described unjust enrichment as a cause of action the necessary elements of which include the absence of an adequate remedy at law." Wolfe & Pittenger, *supra*, § 16.01[b], at 16-18 to -19 & n. 85 (collecting cases). That formulation "is difficult to reconcile with other precedent and historical practices." *Id.*

On several occasions, this court has alluded to the limited role that the absence of an adequate remedy at law plays in the analysis on an unjust enrichment claim. In upholding a claim for unjust enrichment, this court explained that

> [i]n the circumstances of this case, where subject matter jurisdiction exists
> over the unjust enrichment claim under at least the clean-up doctrine, the
> existence or absence of the fifth element, an adequate remedy at law, is

using the same language at the same time to describe a law of unjust enrichment in which law and equity were conjoined.").

[22] *In re Verizon Ins. Coverage Appeals*, 222 A.3d 566, 577 (Del. 2019) (describing unjust enrichment as a "common law claim[]"); *Chertok v. Zillow, Inc.*, 2021 WL 4851816, at *6 & n.68 (Del. Ch. Oct. 18, 2021) (same; citing *Crosse v. BCBSD, Inc.*, 836 A.2d 492, 496–97 (Del. 2003), for its "holding that unjust enrichment claims brought with breach of contract claims are legal claims").

immaterial. Depending on the circumstances, unjust enrichment can be thought of as either a legal or an equitable claim.

*B.A.S.S. Gp., LLC v. Coastal Supply Co., Inc.*, 2009 WL 1743730, at *6 n.61 (Del. Ch. June 19, 2008). Other cases have echoed this observation. *Stevanov v. O'Connor*, 2009 WL 1059640, at *13 n.74 (Del. Ch. Apr. 21, 2009) (same); *Winner Acceptance Corp. v. Return on Cap. Corp.*, 2008 WL 5352063, at *13 n.70 (Del. Ch. Dec. 23, 2008) (same). This court similarly has commented that "[t]he lack of an adequate remedy at law is not critical to an unjust enrichment claim because some unjust enrichment claims may be heard in the law courts." *MetCap*, 2009 WL 513756, at *5 n.26. Rather, that element "is best understood as setting forth the standard for presenting an unjust enrichment claim in equity" when no other basis for jurisdiction exists. *Id.* Notably, if unjust enrichment really required the absence of an adequate remedy at law, then this court would have exclusive jurisdiction over the claim. Yet the Delaware Superior Court decides cases involving claims for unjust enrichments.[23]

With a little digging, it is possible to identify where the "no adequate remedy at law" element entered Delaware's formulation. In a 1996 decision, a master of this court

---

[23] *See Aureus Hldgs., LLC v. Kubient, Inc.*, 2021 WL 3465050, at *4–5 (Del. Super. Aug. 6, 2021) (rejecting a defendant's motion to dismiss a plaintiff's unjust enrichment claim; listing the five element test and finding that the complaint adequately alleged facts to satisfy each element); *see also Crosse*, 836 A.2d at 496–97 (characterizing a plaintiff's unjust enrichment claim as an "off-the-contract theory of recovery that accompanies the [plaintiff's] breach of contract allegations" and as being a "legal, not equitable claim[]," and concluding that "[t]he Superior Court typically has jurisdiction to award this form of relief when it cannot hold the parties to a formal agreement but determines that the aggrieved party is entitled to relief for a benefit conferred on the other party").

considered whether equitable jurisdiction existed in a case where the plaintiff sought a constructive trust over personal property that the plaintiff alleged to own but that the defendant possessed. *Khoury Factory Outlets, Inc. v. Snyder*, 1996 WL 74725 (Del. Ch. Jan. 8, 1996). A "constructive trust is an equitable remedy that is sometimes imposed after presentation of the merits when disgorgement is appropriate." *Oliver v. Bos. Univ.*, 2000 WL 1091480, at *10 (Del. Ch. July 18, 2000). A basis for equitable jurisdiction therefore existed based on the remedy sought. But rather than resting on that ground, the decision embarked on an inquiry into "[w]hat, then, is unjust enrichment, and when is conduct so unconscionable as to call into play the powers of a court of equity?" *Khoury*, 1996 WL 74725, at *10–11. To answer that question, the court looked to a 1977 decision from an intermediate court of appeals in Louisiana, which enunciated the five-element test. *Id.* at *11 (quoting *Abbeville Lumber Co. v. Richard*, 350 So.2d 1292, 1300 (La. Ct. App. 1977).[24] The court expressed doubt about whether there was an enrichment, an impoverishment, or an absence of justification, then held that because the plaintiff sought

---

[24] In *Abbeville*, a father loaned his son money to enable the son to build a horse racing track on property owned by the father, which he leased to his son for that purpose. The son obtained credit from a lumber company and used the credit to purchase supplies. After the son failed to make payments when due, the lumber company placed a lien on the father's property, then sued both the father and son. As one of its claims, the lumber company sought to recover from the father under a theory of unjust enrichment. Applying Louisiana law, the intermediate court of appeals concluded that the lumber company failed to prove it had an "absence of a remedy provided by the law," because the lumber company "clearly ha[d] a remedy against [the son] and the buildings on the premises which admittedly belong to him." *Abbeville*, 350 So.2d at 1300–01. The court also found that "[i]t has not been shown that there is an enrichment to the lessor." *Id.* at 1300.

"money damages," there was "no absence of a remedy at law," and the court was "without jurisdiction to entertain this cause." *Khoury*, 1996 WL 74725, at \*11.

Louisiana is a civil law jurisdiction, so it is always dangerous for a common law court to rely on Louisiana precedent. The Louisiana decision on which the *Khoury* court relied extracted the five-factor test from *Minyard v. Curtis Products, Inc.*, a 1967 decision from the Supreme Court of Louisiana. 205 So.2d 422 (La. 1967). The question in *Minyard* was whether a "petition for indemnity" could be brought under the Louisiana Civil Code. Finding "no express statutory remedy," the Louisiana Supreme Court turned to the "civil law action de in rem verso," which it described as "an action for unjust enrichment." *Id.* at 427. For the elements of the claim, the court looked to a decision by France's *Cour de Cassation. Id.* at 432 (citing Cour de Cassation [Cass.] [Supreme Court for Judicial Matters] June 15, 1892, S. Jur I 1893, 1, 281 (Fr.)). In support of the need to establish the absence of a remedy at law, the court cited a provision of the Louisiana Civil Code that "prohibit[ed] a reference to principles of equity in cases which would allow application of more specific legal action." *Id.* at 433. The *Minyard* decision did not address a common law claim for unjust enrichment and understandably had no occasion to consider the proper formulation of that claim.

Through *Khoury*, Louisiana's formulation of the elements of an unjust enrichment claim entered Delaware law. This court relied on *Khoury*'s formulation in *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571 (Del. Ch. 1998), and *Jackson National Life Insurance Co. v. Kennedy*, 741 A.2d 377 (Del. Ch. 1999). Neither decision explored the formulation of the elements of the claim. The Delaware Supreme Court then relied on

90

*Jackson* and *Cantor* when identifying the elements of a claim for unjust enrichment in *Nemec v. Shrader*. 991 A.2d at 1130. The Delaware Supreme Court treated the formulation as settled. *Id.*

In an enterprise as challenging and multifaceted as the law, there invariably will be jurisprudential missteps. *Khoury*'s framing of the elements of unjust enrichment was one such misstep. The requirement to plead the absence of a remedy at law meandered from France's Cour de Cassation through the Supreme Court of Louisiana to a decision by a Louisiana intermediate court of appeals to a decision by this court on the existence of equitable jurisdiction, where an alternative basis for equitable jurisdiction appears to have existed. Yet even as *Khoury*'s framing of the elements spread into other decisions, rulings like *B.A.S.S. Group*, *Stevenov*, *Winner Acceptance*, and *MetCap* pointed out the incongruity and counseled restraint.

The tension is easily resolved. If a plaintiff seeks to pursue a claim for unjust enrichment in the Court of Chancery and has no other basis for equitable jurisdiction, then the plaintiff must establish the absence of a remedy at law to establish equitable jurisdiction. Colloquially speaking, the absence of a remedy at law can be viewed as an element of the claim. Outside of a dispute over jurisdiction, however, it is not necessary for a plaintiff to plead or later prove the absence of an adequate remedy at law. With this

point clarified, Delaware law accords with the Restatement of Unjust Enrichment and with other jurisdictions that do not include the fifth element in the framing of the claim.[25]

Accepting for purposes of analysis that the plaintiff's claims for breach of contract and for breach of fiduciary duty could provide him with an adequate remedy, that reality does not defeat his claim for unjust enrichment. The plaintiff has pled adequately that Smith received a benefit, that the receipt of the benefit was unjustified, and that there is a connection between the receipt of a benefit and an invasion of the Company's legally protected rights, embodied here in the form of the 2019 Plan.

---

[25] *See, e.g.*, *Gordon v. Sig Sauer, Inc.*, 2019 WL 4572799, at *16 (S.D. Tex. Sept. 20, 2019) (denying a motion to dismiss an unjust enrichment claim on the basis that the plaintiff had an adequate remedy at law because "there is no requirement that a claimant who seeks equitable remedies must first demonstrate the inadequacy of a remedy at law" (cleaned up)); *Jordan v. Wonderful Citrus Packing LLC*, 2018 WL 4350080, at *5 (E.D. Cal. Sept. 10, 2018) (denying motion to dismiss unjust enrichment claim because it "invoke[d] the fallacy that modern quasi-contract claims cannot lie where other adequate remedies at law exist because quasi-contract claims are equitable"); *Hanley v. Trendway Corp.*, 1995 WL 103748, at *2 (N.D. Ill. Mar. 6, 1995) ("[T]his Court notes that Illinois courts have rejected the argument that an action for unjust enrichment should always be dismissed where the plaintiff has a full and adequate remedy at law."); *S. Cnty. Post & Beam, Inc. v. McMahon*, 116 A.3d 204, 214 (R.I. 2015) ("The three elements for unjust enrichment and quantum meruit are well settled in our jurisprudence and do not include a requirement that the proponent of the claim prove that it lacks an adequate remedy at law."); *see also Dastgheib v. Genentech, Inc.*, 457 F. Supp. 2d 536, 541–43 (E.D. Pa. 2006) (analyzing whether a plaintiff's unjust enrichment claim was "legal or equitable;" discussing Lord Mansfield's decision in *Moses v. Macferlan* and concluding that the plaintiff's claim was analogous to an action in *assumpsit* and was thus a legal claim); *Reidling v. Holcomb*, 483 S.E.2d 624, 626 (Ga. Ct. App. 1997) ("The theory of recovery for unjust enrichment arises both at law and equity. If this action were exclusively in equity, then appellant's acts and omissions would bar any relief under the maxims of equity." (citations omitted)).

92

**D.     The Ratification Argument**

The defendants' next argument is perhaps their most extreme. They contend that the non-binding, advisory vote on the Say-On-Pay Resolution ratified the Challenged Awards and extinguished the plaintiff's claims. That theory is frivolous.

**1.      Ratification Of The Directors' Authority To Act**

A fully informed vote by disinterested stockholders can have significant effects on a challenge to corporate action. Under Professor Berle's famous formulation, corporate action is twice tested, once for compliance with applicable law and a second time to determine whether the fiduciaries who caused the corporation to take action fulfilled their duties. *See* A.A. Berle, Jr., *Corporate Powers as Powers in Trust*, 44 Harv. L. Rev. 1049, 1049 (1931). Stockholder approval has implications for both types of challenges. Although recent Delaware cases addressing the effects of stockholder approval frequently address the standard of review that will govern a claim for breach of fiduciary duty, this case does not involve a dispute over the governing standard of review: The parties agree that to the extent that the Board exercised discretionary judgment on a matter where the Board had authority to act, then the business judgment rule applies.[26] The question instead is one of

---

[26] The effect of stockholder approval on claims for breach of fiduciary duty has evolved significantly over time, and this decision is not the place to provide a recapitulation. For present purposes, it suffices to say that Delaware cases have long recognized that when a plaintiff claims that the directors failed to exercise due care before committing the corporation to a transaction, then fully informed stockholder approval will extinguish the claim. *See, e.g.*, *Smith v. Van Gorkom*, 488 A.2d 858, 889 (Del. 1985) (subsequent history omitted) ("[T]he merger can be sustained, notwithstanding the infirmity of the Board's action, if its approval by majority vote of the shareholders is found to have been based on an informed electorate."); *Lewis v. Vogelstein*, 699 A.2d 327, 336

authority: Whether the Board had the authority to grant Awards that made more shares subject to the grants than the Performance Share Limitation permitted.

Framed in terms of authority, "[r]atification is a concept deriving from the law of agency which contemplates the *ex post* conferring upon or confirming of the legal authority of an agent in circumstances in which the agent had no authority or arguably had no authority." *Lewis*, 699 A.2d at 334. "As a fundamental proposition, Delaware courts have

---

n.13 (Del. Ch. 1997) (Allen, C.) ("[I]t has been held, on authority, that ratification of a transaction that is thereafter made the subject of a breach of care claim is effective to defeat such a claim completely."). Language in *Van Gorkom* created confusion about whether a valid stockholder ratification could extinguish a duty of loyalty claim. Ten years after *Van Gorkom*, this court rejected that concept. *See In re Wheelabrator Techs., Inc. S'holders Litig.*, 663 A.2d 1194, 1205 (Del. Ch. 1995). In *Wheelabrator*, the court explained that in its survey of the law, "the ratification cases involving duty of loyalty claims have uniformly held that the effect of shareholder ratification is to alter the standard of review, *or* to shift the burden of proof, *or* both." *Id.* at 1202–03. Since *Wheelabrator*, the law governing the effect of ratification on loyalty claims has continued to develop. Most notably, in *Corwin v. KKR Financial Holdings, LLC*, the Delaware Supreme Court held that if a majority of disinterested stockholders acted on a fully informed basis to approve a merger with a party other than a controller, then the act of stockholder approval results in any claim for breach of fiduciary duty being reviewed using the business judgment rule rather than a more stringent standard of review. 125 A.3d 304, 308 (Del. 2015). The Delaware Supreme Court also has held that in a transaction between a controlled corporation and its controlling stockholder, the combination of disinterested committee approval and majority-of-the-minority stockholder approval results in any claim for breach of fiduciary duty being reviewed using the business judgment rule rather than a more stringent standard of review. *Kahn v. M & F Worldwide Corp.*, 88 A.3d 635, 644 (Del. 2014) ("[B]usiness judgment is the standard of review that should govern mergers between a controlling stockholder and its corporate subsidiary, where the merger is conditioned *ab initio* upon both the approval of an independent, adequately-empowered Special Committee that fulfills its duty of care; and the uncoerced, informed vote of the majority of the minority stockholders."), *overruled on other grounds by Flood v. Synutra Int'l, Inc.*, 195 A.3d 754 (Del. 2018); *see In re Tesla Motors, Inc. S'holder Litig.*, 2022 1237185, at *28–29 & n.365 (Del. Ch. Apr. 27, 2022); *In re EZCORP Inc. Consulting Agreement Deriv. Litig.*, 2016 WL 301245, at *11 (Del. Ch. Jan. 25, 2016).

held that 'a validly accomplished shareholder ratification relates back to cure otherwise unauthorized acts of officers and directors.'" 1 R. Franklin Balotti & Jesse A. Finkelstein, *Balotti and Finkelstein's Delaware Law of Corporations and Business Organizations* § 7.28 (4th ed. & 2022-1 Supp.) (quoting *Michelson v. Duncan*, 407 A.2d 211, 219 (Del. 1979)). Under these principles, ratification can extinguish certain claims that the board exceeded its authority.[27]

For a vote to have ratifying effect, the stockholders must be told specifically (i) what they are voting on and (ii) what the binding effect of a favorable vote will be. *See* Wolfe & Pittenger, *supra*, § 15.06[b], at 15-61. Taking those points in reverse order, stockholders must understand the specific consequences of a favorable vote. "Shareholder ratification is valid only where the stockholders so ratifying are adequately informed of the consequences of their acts and the reasons therefor." *Michelson*, 407 A.2d at 220. If stockholders are not adequately informed of the consequences of their acts, then the ratification is not valid. If

---

[27] *See Wheelabrator*, 663 A.2d at 1203 (explaining that ratification will operate as a complete defense "where the board of directors takes action that, although not alleged to constitute *ultra vires*, fraud, or waste, is claimed to exceed the board's authority"). The Delaware Supreme Court has held that the term "ratification" should be "limited to its so-called 'classic' form; that is to circumstances where a fully informed shareholder vote approves director action that does *not* legally require shareholder approval to become legally effective." *Gantler v. Stephens*, 965 A.2d 695, 713 (Del. 2009). Put another way, "'ratification' legally describes only corporate action where stockholder approval is not statutorily required for its effectuation." *Id.* at 714 n.55. The Challenged Awards did not require stockholder approval to become effective, whether under the Delaware General Corporation Law or any other statute. This case thus involves the potential application of ratification in its classic sense.

the consequences of the stockholder vote are unclear or ambiguous, then the ratifying vote will not have legal effect.

Stockholders also must be presented with a specific decision to ratify. As the Delaware Supreme Court has explained, "the only director action or conduct that can be ratified is that which the shareholders are specifically asked to approve." *Gantler*, 965 A.2d at 713; *see In re Emerging Commc'ns, Inc. S'holders Litig.*, 2004 WL 1305745, at *31 (Del. Ch. May 3, 2004) ("Shareholders cannot be deemed to have ratified board action unless they are afforded the opportunity to express their approval of the precise conduct being challenged"); *see also In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 68 (Del. 1995) (rejecting ratification defense where stockholders "did not vote in favor of the precise measures under challenge in the complaint"). By contrast, "[w]hen stockholders know precisely what they are approving, ratification will generally apply." *In re Invs. Bancorp, Inc. S'holder Litig.*, 177 A.3d 1208, 1222 (Del. 2017).

The practice of presenting stockholders with a single vote on multiple items is called "bundling." In a bundled vote, "the shareholders are robbed of expressing a distinct choice with respect to each because their joinder means the package must be approached by the shareholders as an all-up or all-down vote." James D. Cox et al., *Quieting the Shareholders' Voice: Empirical Evidence of Pervasive Bundling in Proxy Solicitations*, 89 S. Cal. L. Rev. 1179, 1191–92 (2016). A bundled vote is thus problematic because stockholders are not given a precise choice. An example of a bundled vote would be a binding resolution in which stockholders were asked to ratify the executive compensation paid to multiple executives. The stockholders would know what they were voting on, and

96

they could be told what the effects of the vote would be. A favorable vote would demonstrate that the stockholders approved the compensation in the aggregate and accepted the consequences. The bundled vote would not show that the stockholders had approved the compensation on a particular executive, or a subset of the executives.[28]

---

[28] There are federal regulations that address bundling. *See* 17 C.F.R. § 240.14a-4(a)(3) ("The form of proxy . . . [s]hall identify clearly and impartially each separate matter intended to be acted upon, whether or not related to or conditioned on the approval of other matters, and whether proposed by the registrant or security holders."). In a leading case interpreting what constitutes a "separate matter," the United States Court of Appeals for the Second Circuit held

> that in the absence of explicit guidance from the applicable state law, the actual issue of what constitutes a 'separate matter' for purposes of the two rules is ultimately a question of fact to be determined in light of the corporate documents and in consideration of the SEC's apparent preference for more voting items rather than fewer.

*Koppel v. 4987 Corp.*, 167 F.3d 125, 138 (2d Cir. 1999). The Second Circuit noted that the SEC's intent was to "'unbundle management proposals' and that those individual voting items may well constitute closely related matters." *Id.* (internal quotation marks omitted). In a 2013 decision, the United States District Court for the Southern District of New York further interpreted the antibundling regulations as prohibiting management from proposing multiple charter amendments "by treating [the amendments] as one vote on the restatement of corporate documents, but it may combine ministerial or technical matters that do not alter substantive shareholder rights." *Greenlight Cap., L.P. v. Apple, Inc.*, 2013 WL 646547, at *5 (S.D.N.Y. Feb. 22, 2013) (cleaned up). The court opined that its interpretation comported with the "dual purpose[s]" of the antibundling rules "to permit shareholders to (1) communicate to the board of directors their views on each of the matters put to a vote, and (2) not be forced to approve or disapprove a package of items and thus approve matters they might not if presented independently." *Id.* (quoting Securities Exchange Act Release No. 34-30849, 1992 WL 151037, at *6 (Jun. 23, 1992)). In 2014, the SEC released a Compliance and Disclosure Interpretation stating that "[w]hile the staff generally will object to the bundling of multiple, material matters into a single proposal . . . [,] the staff will not object to the presentation of multiple changes to an equity incentive plan in a single proposal." U.S. Sec. & Exch. Comm'n, *Compliance and Disclosure Interpretations for Exchange Act Rule 14a-4(a)(3),*

## 2.    The Say-On-Pay Resolution

The defendants staked their ratification defense on the explicitly advisory and non-binding Say-On-Pay Resolution. That argument fails for multiple reasons. Ratification is unavailable because the stockholders cast an "advisory vote" on an "advisory proposal." Ratification is also unavailable because for purposes of the Challenged Awards, the Say-On-Pay Resolution was doubly bundled: The Challenged Awards were just one part of Smith's overall compensation, and the request for an advisory vote combined Smith's overall compensation with the overall compensation of the Company's four other named executive officers. Were that not enough, ratification is unavailable under federal law.

### a.    Non-Binding Effect

The Say-On-Pay Resolution could not have any effect because it was expressly advisory. Ratification is only available if stockholders understand the specific consequences of a favorable vote. *See Michelson*, 407 A.2d at 220. If stockholders are told that a vote will not have any effect, then it does not have any effect.

The Company repeatedly told stockholders that the Say-On-Pay Resolution would not have any effect. The 2021 Proxy titled the section on the Say-On-Pay Resolution as the "NON-BINDING ADVISORY VOTE ON COMPANY'S EXECUTIVE COMPENSATION." 2021 Proxy at 93. The 2021 Proxy noted that the purpose of the Say-On-Pay Resolution was to provide the Company's stockholders "with the opportunity to

---

https://www.sec.gov/divisions/corpfin/guidance/14a-interps.htm (last updated Jan. 24, 2014).

98

vote to approve, on a non-binding advisory basis," the executive compensation of certain officers. *Id.* The 2021 Proxy then explained under the subheading "Effect of 'Say-on-Pay' Vote" that "the Say-on-Pay vote is a non-binding advisory vote only." *Id.* It then reiterated that the "vote on the Company's executive compensation matters will not be binding on our Board of Directors." *Id.* The 2021 Proxy concluded its discussion of the Say-On-Pay Resolution with the following statement, printed in bold and red text: "THE BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS A VOTE <u>FOR</u> THE ADVISORY PROPOSAL TO APPROVE NAMED EXECUTIVE OFFICER COMPENSATION." *Id.*

To recap, in just one page, the 2021 Proxy told stockholders four times that the vote was non-binding, then added a fifth reminder with the concluding proclamation that it was an "ADVISORY PROPOSAL." Yet despite having told the stockholders that the vote on the Say-On-Pay Resolution was non-binding and advisory, the defendants came into court and claimed that the Say-On-Pay Resolution had the binding effect of extinguishing any challenge to the Challenged Awards. One might have hoped that someone would have thought a little more about that argument.

### b. Insufficient Specificity

The Say-On-Pay Resolution could not have ratifying effect because it was not sufficiently specific. Ratification is "available only where a majority of informed, uncoerced, and disinterested stockholders vote in favor of a *specific decision* of the board of directors." *Calma v. Templeton*, 114 A.3d 563, 586 (Del. Ch. 2015) (footnotes omitted). In a transcript ruling, then-Chancellor Bouchard explained that after surveying the law, a ratifying vote is only effective if there is "ratification of a specific decision." *Larkin v.*

99

*O'Connor*, C.A. No. 11338-CB, Dkt. 29 at 69–70. (Mar. 22, 2016) (TRANSCRIPT). He

further explained:

> And what underlies that is the notion that there has to be a meeting of the minds, if you will, about what's actually being approved between, on the one hand, the company . . . in terms of what it's doing, and, on the other hand, the stockholders who were asked to vote on something. There's got to be sufficient specificity so there is not ambiguity that they're agreeing to the same thing, basically.

*Id.* at 70; *see* Cox et al., *supra*, at 1186 ("Because consent is a necessary feature for the

contractual paradigm and therefore is foundational to corporate law today, the efficacy of

proxy voting is of great import; simply stated, because a contract arises when and only

when there is a meeting of the minds on the parties' respective undertakings, choice, both

free and informed, is central to the relationship owners have to their corporation.").

The Say-On-Pay Resolution did not have the requisite specificity to ratify the

Challenged Awards. The Say-On-Pay Resolution did not make clear that the stockholders

were ratifying the decision to grant the Challenged Awards. The Say-On-Pay Resolution

presented stockholders with the overall compensation for five named executive officers.

Dkt. 10 at 23–24. If asked to deliver a binding vote on the compensation as a whole, a

favorable vote would have demonstrated that the stockholders approved the aggregate

amount. That is a different question than approving a specific component of one

executive's compensation that otherwise violated a provision of the governing

compensation plan.

To obtain a ratifying vote on the Challenged Awards, the Company would have

needed to tell stockholders that (i) there was a dispute over whether the Challenged Awards

complied with the Performance Share Limitation, (ii) the Company was asking the stockholders to ratify the Challenged Awards for purposes of any failure to comply with the Performance Share Limitation, and (iii) if a majority of the disinterested stockholders approved the Challenged Awards, then their action would extinguish any challenge to the Challenged Awards based on a failure to comply with the Performance Share Limitation. The Say-On-Pay Resolution did not begin to approach that level of specificity.

### c. The Strictures Of Federal Law

So far, this decision has explained why a non-binding, non-specific resolution like the Say-On-Pay Resolution could not have had ratifying effect as a matter of Delaware law. Federal law supplies an additional reason why the vote could not have ratifying effect.

The Say-On-Pay Resolution was not a special ratifying vote. It was a periodic say-on-pay vote contemplated by the Dodd-Frank Act. *See* Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203, 124 Stat. 1376 (2010) (codified as amended). Among other things, the Dodd-Frank Act provided as follows:

> Not less frequently than once every 3 years, a proxy or consent or authorization for an annual or other meeting of the shareholders for which the proxy solicitation rules of the Commission require compensation disclosure shall include a separate resolution subject to shareholder vote to approve the compensation of executives, as disclosed pursuant to section 229.402 of title 17, Code of Regulations, or any successor thereto.

15 U.S.C. § 78n-1(a) (the "Say-On-Pay Statute").

Although the Say-On-Pay Statute requires a "shareholder vote," the statute states that the "shareholder vote . . . shall not be binding on the issuer or the board of directors of

101

an issuer." *Id.* § 78n-1(c). The Say-On-Pay Statute also contains a sub-section titled "Rule

of construction," which states that the

> shareholder vote . . . may not be construed
>
> (1) as overruling a decision by such issuer or board of directors;
>
> (2) to create or imply any change to the fiduciary duties of such issuer or board of directors;
>
> (3) to create or imply any additional fiduciary duties for such issuer or board of directors; or
>
> (4) to restrict or limit the ability of shareholders to make proposals for inclusion in proxy materials related to executive compensation.

*Id.* § 78n-1(c)(1)–(4) (formatting added).

Regulatory commentary, treatises, and caselaw uniformly emphasize that a say-on-

pay vote is non-binding.[29] In light of that reality, a series of courts have held that the failure

---

[29] *See, e.g.*, Shareholder Approval of Executive Compensation and Golden Parachute Compensation, Release Nos. 33-9178, 34-63768, 76 Fed. Reg. 6009, at 51 n. 175 (2011) ("Even though each of the shareholder advisory votes required by Section 14A is non-binding pursuant to the rule of construction in Section 14A(c) . . . we believe these votes could play a role in an issuer's executive compensation decisions."); 11 David Tetrick, Jr. & Lisa R. Bugni, *Business & Commercial Litigation in the Federal Courts* § 125:3 (5th ed.), Westlaw (database updated Dec. 2021) ("Companies are required to make disclosures in their proxy statements regarding the say-on-pay vote, including the fact that the vote is nonbinding. Although the vote is not binding, companies will be required to disclose in future proxy statements whether the company considered the results of the most recent advisor vote and, if so, how." (footnotes omitted)); 2 Thomas Lee Hazen, *Treatise on the Law of Securities Regulation* § 10:6, Westlaw (Dec. 2021 update) ("The Dodd-Frank Wall Street Reform Act of 2010 included a mandate that management solicit proxies for non-binding shareholder vote on a resolution seeking shareholder approval of Named Executive Officer (NEO) compensation."); *Greenlight Cap.*, 2013 WL 646547, at *11 ("Enacted as part of the Dodd-Frank Act in 2010, 15 U.S.C. § 78n-1(a) requires that companies conduct a non-binding shareholder vote on executive compensation at least once every three years."); *S.E. Pa. Transp. Auth. v. Facebook, Inc.*, 2019 WL 5579488, at

of stockholders to approve a say-on-pay resolution does not have any effect on a claim challenging the underlying compensation.[30] The defendants assert the mirror-image proposition. They claim that even though a negative say-on-pay vote has no effect on a challenge to a compensation decision, a positive say-on-pay vote has the effect of extinguishing challenges to a compensation decision. The Say-On-Pay Statute makes clear that a positive say-on-pay vote cannot have that effect.

The defendants notably failed to cite the Say-On-Pay Statute in their briefs. They initially described the vote on the Say-On-Pay Resolution as if it was a binding ratification vote. Not until more than twenty pages later did the defendants acknowledge that the Say-On-Pay Resolution was just that—a non-binding say-on-pay vote.

Setting aside any questions of Delaware law, federal law makes clear that the Say-On-Pay Resolution had no effect on the validity of the Challenged Awards or the directors' compliance with their fiduciary duties.

---

*3 (Del. Ch. Oct. 29, 2019) (recognizing that the stockholder say-on-pay vote is a "non-binding" and "advisory" vote).

[30] *See, e.g.*, *Raul v. Rynd*, 929 F. Supp. 2d 333, 346 (D. Del. 2013) ("Dodd–Frank explicitly prohibits construing the shareholder vote as 'overruling' the [b]oard's compensation decision."); *Gordon v. Goodyear*, 2012 WL 2885695, at *10 (N.D. Ill. July 13, 2012) (rejecting a plaintiff's attempt "to use [a] negative shareholder vote [on say-on-pay] alone to rebut the business judgment rule and to excuse the demand requirement and permit her to pursue a breach of fiduciary claim against the directors" because it would "circumvent[] the protections in the statute").

## IV.    DUPLICATIVE CLAIMS

Having determined that each of the counts of the complaint states a claim on which relief can be granted, this decision turns to the final issue that this case raises. According to the defendants, the plaintiff cannot assert either a claim for breach of fiduciary duty or a claim for unjust enrichment because even if the allegations of the complaint support those claims, they cannot "be maintained alongside a breach of contract claim." Dkt. 13 at 23; *see* Dkt. 6 at 24–25. Of course, the defendants maintain that the plaintiff has not stated and cannot prove a breach of contract claim. They nevertheless argue that merely by asserting a breach of contract claim, the plaintiff has made an election that prevents the plaintiff from pleading other claims in the alternative. Under the defendants' modern-day reprise of form pleading, the plaintiff chose a claim for breach of contract and, having made that choice, cannot resort to another.

### A.    A Refresher On Pleading Doctrine

In language whose significance may have faded with the passage of time, Court of Chancery Rule 2 states, "There shall be 1 form of action to be known as 'civil action.'" Ct. Ch. R. 2. Implemented when Delaware adopted the federal rules, Court of Chancery Rule 2 tracks its federal model. The rule has been characterized as perhaps "the most fundamental rule of all." 4 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1042 (4th ed.), Westlaw (database updated Apr. 2022).

The adoption of Rule 2 had several important consequences. In the federal system, Rule 2 both merged the separate systems of law and equity and abolished any remaining

104

vestige of the forms of action. *Id.* §§ 1042–44. In Delaware, which maintained its separate court of equity, Rule 2 did not have the first effect, but it did have the second.

Form pleading developed under the English common law. A plaintiff who wished to file suit in the Court of Common Pleas or before the King's Bench "had to purchase a royal writ . . . to authorize the commencement of proceedings." J.H. Baker, *An Introduction to English Legal History* 49 (2d ed. 1979). The clerks "kept model writs to be copied as requested by individual plaintiffs." Daniel R. Coquillette, *The Anglo-American Legal Heritage* 151 (2d ed. 2004). To bring a case, a plaintiff had to use one of the model writs, although in an exceptional case a clerk could issue a new writ if "consonant with reason and not contrary to the law, provided it has been granted by the King and approved by his council." *Id.* (quoting Henry de Bracton, *De Legibus et Consuetudinibus Regni Angliae* [On the Laws and Customs of England], fol. 413b).

Under the common law system, a plaintiff "did not, therefore, concoct his own writ. . . . He had to either find a known formula to fit his case, or apply for a new one to be invented." Baker, *supra*, at 51. Over time, however, so many writs arose that a request for a new writ "was seen as something of a grievance." *Id.* By 1300, the available writs were largely fixed. *Id.* If the plaintiff could not find a writ that applied to his situation, then "he was without remedy as far as the king's courts were concerned." *Id.*

The selection of a writ was not only necessary to commence the case.

> The choice of writ governed the whole course of litigation from beginning to end, and the plaintiff selected the most appropriate writ at his peril. . . . The classification of writs was therefore more than just a convenience for reference purposes; it was a classification of all the procedures, and in course of time of the substantive principles, of the common law.

105

*Id.* at 51–52. Because the different writs resulted in the application of different law and procedure, the writs became known as "forms of action." *Id.* at 52. Using a famous dueling metaphor, two commentators emphasized the consequences of choosing a particular form:

> [The collection of forms] contains every weapon of medieval warfare from the two-handed sword to the poniard. The man who has a quarrel with his neighbor comes thither to choose his weapon. The choice is large; but he must remember that he will not be able to change weapons in the middle of the combat and also that every weapon has its proper use and may be put to none other. If he selects a sword, he must observe the rules of sword-play; he must not try to use his crow-bow as a mace. To drop metaphor, our plaintiff is not merely choosing a writ, he is choosing an action, and every action has its own rules.

2 Sir Frederick Pollock & Frederic William Maitland, *The History of English Law Before the Time of Edward I*, at 588–89 (2d ed. 1898).

Even as some jurisdictions sought to update their rules of pleading, the plaintiff's obligation to plead a single route to relief persisted under a concept known as the "theory of the pleadings." *See* 5 Wright & Miller, *supra*, § 1219. As with the common law writs, this doctrine required that a complaint "proceed upon some definite theory, and on that theory the plaintiff must succeed, or not succeed at all." *Mescall v. Tully*, 91 Ind. 96, 99 (1883). Once again, the plaintiff had to pick a legal theory at the outset of the case and stick with it. *See generally* Fleming James, Jr., *The Objective and Function of the Complaint: Common Law—Codes—Federal Rules*, 14 Vand. L. Rev. 899, 910–11 (1961).

Under these approaches to pleading, "[a]lternative and hypothetical pleading generally was not permitted." 5 Wright & Miller, *supra*, § 1282. A treatise from the era of common law pleading stresses this point: "Pleadings must not be in the alternative. Where a legal duty imposes the due performance of one thing or another, the pleading must state

106

that one was performed, and specify which one." Benjamin J. Shipman, *Handbook of Common-Law Pleading* § 321, at 519 (3d ed. by Henry Winthrop Ballantine 1923). The underlying rationale was that a plaintiff needed to plead with "certainty in the hope of apprising the adversary of the precise issues involved in the litigation." 5 Wright & Miller, *supra*, § 1282. But it had many negative consequences:

> As a result, a party was required to elect a particular set of facts and a legal theory at the pleading stage. Unfortunately, this forced a litigant to set forth his allegations with a degree of certainty that often was not warranted in terms of the state of the pleader's knowledge at that point in the case. If the facts he asserted in the pleadings were not confirmed by later proof, the action or defense would fail even if the proof demonstrated a right to relief or defense on some other theory.

*Id.*

The adoption of Rule 2 abrogated these concepts. After the adoption of the rule, "the common law forms of action have lost all significance, and it no longer is a basis for objection that the relief sought is inconsistent with the theory of the complaint or that the relief granted was not demanded in the pleadings." *Id*. § 1044.

In Delaware, the adoption of Rule 2 carried particular significance. Unlike the federal courts, the New York courts, and some other states that had moved away from the common law system, Delaware still followed the rules of common law pleading:

> Before 1948, Delaware adhered to the common law system of pleading as it had been developed and existed in England at the time of the separation of the American colonies. In England, in 1834, important changes had been made by the Hilary Rules and the later Procedural Acts. But in Delaware, the changes in pleading thereby effected were disregarded and, except for few statutory or constitutional modifications, the common law system of pleading as it existed at the time of our independence was the system of pleading in use. Our practice and procedure were still controlled by the Statute of 27 Elizabeth c. 5 and the Statute of 4 Anne c. 16. Prior to 1948, we dealt with

107

the replication de injuria, the similiter, the absque hoc, the negative pregnant and the action of detinue. We concerned ourselves with pleas of nul tiel record and the court was called upon to announce that the opposite party "may not traverse the inducement of a special traverse."

Daniel L. Herrmann, *The New Rules of Procedure in Delaware*, 18 F.R.D. 327, 336–37 (1956) (footnotes omitted). It was in 1948, through the adoption of the Court of Chancery Rules and the analogous Superior Court Rules, that Delaware "shook off the shackles of medieval scholasticism and adopted Rules governing civil procedure modeled upon the Federal Rules." *Id.* at 327 (cleaned up).

Looking back on the adoption of the rules after nearly a decade of use, Chief Justice Herrmann explained that the purpose of adopting the Rules was "the elimination of the fine technicalities of pleading." *Id.* at 338. Continuing, he explained that

> [n]otice pleading has replaced fully informative common law pleading and it has been stated that the "theory underlying the present rules is that a plaintiff must put a defendant on fair notice in a general way of the cause of action asserted, which shifts to the defendant the burden to determine the details of the cause of action by way of discovery for the purpose of raising legal defenses."

*Id.* at 342 (quoting *Klein v. Sunbeam Corp.*, 94 A.2d 385, 391 (Del. 1952)).

Pertinent to the current case, Chief Justice Herrmann stressed that "[t]he de-emphasis upon pleadings and the re-emphasis upon ascertainment of truth is reflected *in the procedure for alternative pleading* and the almost automatic amendment of pleadings." *Id.* at 338 (emphasis added). By contrast, under the common law pleading system that prevailed before the adoption of the Court of Chancery Rules, "inconsistent facts and theories could not be pleaded." *Id.* at 337.

The centerpiece of the operative approach to pleading is Court of Chancery Rule 8. Dispensing with any requirement to select or plead a particular cause of action, Rule 8 states: "A pleading which sets forth a claim for relief . . . shall contain (1) a short and plain statement of the claim showing that the pleader is entitled to relief and (2) a demand for judgment for the relief to which the party deems itself entitled." Ct. Ch. R. 8(a). Confirming the abolition of the forms of action, Rule 8(e)(1) states that "[n]o technical forms of pleading or motions are required." *Id.* R. 8(e)(1).

Unlike at common law, Rule 8(e)(2) explicitly permits a party to plead alternative and even inconsistent theories:

> A party may set forth 2 or more statements of a claim or defense alternatively or hypothetically, either in 1 count or defense or in separate counts or defense. . . . A party may also state as many separate claims or defenses as the party has regardless of consistency.

Ct. Ch. R. 8(e)(2). The Court of Chancery Rules thus explicitly reject the "single weapon theory" of common law pleading by permitting pleaders "to choose as many theoretical weapons as [they] think [their] case needs." John W. Curran, *Afterthoughts of the Institute on Federal Rules of Civil Procedure at Cleveland, July 1938*, 14 Notre Dame L. Rev. 103, 105 (1938).

## B.     The Contractual Preclusion Argument

In a throwback to common law pleading, the defendants argue that because the plaintiff sought to plead a claim for breach of contract, the plaintiff cannot maintain a claim for breach of fiduciary duty or a claim for unjust enrichment. As the defendants see it, by attempting to plead a claim for breach of contract, the plaintiff has selected a weapon that

precludes resort to others. The defendants say the claim cannot survive pleading-stage analysis, but it nevertheless occupies the field such that the plaintiff cannot advance alternative theories.

No matter how many theories or alternative claims a plaintiff advances at the pleading stage, a plaintiff can recover only a single judgment, and a plaintiff cannot recover duplicative remedies. *See McPadden v. Sidhu*, 964 A.2d 1262, 1276–77 (Del. Ch 2008). It is possible, even likely, that by the time of trial, a plaintiff may be able to establish only certain theories (if any). It may be that proving a particular theory forecloses other theories. For example, in a post-trial decision, this court declined to award relief for unjust enrichment when an express contract governed the relationship. *See ID Biomedical Corp. v. TM Techs., Inc.*, 1995 WL 130743, at *15 (Del. Ch. Mar. 16, 1995). Subsequently, through reliance on post-trial decisions like *ID Biomedical*, defendants sought to engage the court in similar analyses at the pleading stage. *See, e.g., Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 891 & n.63 (Del. Ch. 2009) (granting a motion to dismiss an unjust enrichment claim; quoting the pleading stage case *Bakerman v. Sidney Frank Importing Co.*, 2006 WL 3927242, at *18 & n.102 (Del. Ch. Oct. 10, 2006), which in turn cited the post-trial decision in *ID Biomedical Corp.*).

That determination does not need to be made on the pleadings in every case. "A party does not have a right to a pleading stage ruling." *Spencer v. Malik*, 2021 WL 719862, at *5 (Del. Ch. Feb. 23, 2021) (ORDER). Rule 12(d) states explicitly that pleading-stage motions brought under Rule 12 "shall be heard and determined before trial on application of any party, *unless the Court orders that the hearing and determination thereof be*

110

*deferred until trial.*" Ct. Ch. R. 12(d) (emphasis added)). Likewise, Rule 12(a)(1) states that a court "may postpone the disposition of" a pleading stage motion until a later stage of the case, including "until the trial on the merits.' Ct. Ch. R. 12(a)(1)); *see In re Pattern Energy Gp. Inc. S'holders Litig.*, 2021 WL 1812674, at *46 & n.612 (Del. Ch. May 6, 2021).

There have been and will continue to be cases where it is beneficial for a court to examine the potential interaction among claims at the pleading stage. Multiple Delaware decisions have engaged in the type of analysis that the defendants seek.[31] The *Pfeiffer* decision is a case involving an equity compensation plan that considered and rejected the type of argument that the defendants advance. *See* 2013 WL 5988416, at *10.

Pre-trial rulings of that sort can help formulate and simplify the issues for trial. *See* Ct. Ch. R. 16(a); *see also In re Matter of Scot. Re (U.S.), Inc.*, — A.3d —, 2022 WL 1133773, at *9 (Del. Ch. Apr. 18, 2022) (discussing court's role in case management). But a court is not required to wrestle at the pleading stage with how one claim might interact

---

[31] For examples of pleading-stage decisions analyzing the interaction between a claim for breach of contract and a claim for breach of fiduciary duty, see, e.g., *In re WeWork Litig.*, 2020 WL 6375438, at *12 (Del. Ch. Oct. 30, 2020); *PT China v. PT Korea LLC*, 2010 WL 761145, at *7 (Del. Ch. Feb. 26, 2010); *Solow v. Aspect Res., LLC*, 2004 WL 2694916, at *4 (Del. Ch. Oct. 19, 2004). For examples of pleading stage decisions analyzing the interaction between a claim for breach of contract and a claim for unjust enrichment, see, e.g., *Espinoza v. Zuckerberg*, 124 A.3d 47, 66–67 & n.102 (Del. Ch. 2015) (collecting cases); *Calma v. Templeton*, 114 A.3d 563, 591 n.133 (Del. Ch. 2015); *Kuroda*, 971 A.2d at 891; *Bakerman*, 2006 WL 3927242, at *18–19.

with another. "Not all disputes can or should be resolved at the pleading stage." *Spencer*, 2021 WL 719862, at *5.

The current case does not warrant additional pleading-stage pondering. The plaintiff has alleged facts that support a claim for breach of contract, claims for breach of fiduciary duty, and a claim for unjust enrichment. All of the claims arise from a common nucleus of operative fact, so a pleading-stage ruling is unlikely to simplify discovery or the presentation of the evidence at trial. There is no benefit to be gained at this stage from delving into the alternative theories to assess how they may interact.

If a party obtains summary judgment on a particular claim, then it would be logical to evaluate the implications for other claims in the case. An obvious candidate for summary disposition in this case is the breach of contract claim, where the language is plain and the defendants have not offered a reasonable reading. At that point, it might be worthwhile to see if the other claims could proceed.

Peaking ahead, it seems highly unlikely that a victory for the plaintiff on the claim for breach of contract would foreclose the plaintiff from proceeding with its claims for breach of fiduciary duty. The claim for breach of contract and the claim for breach of fiduciary duty do not wholly overlap. *See Bäcker v. Palisades Growth Cap. II, L.P.*, 246 A.3d 81, 109 (Del. 2021). The 2019 Plan did not create the fiduciary relationship that the plaintiff invokes. Depending on how one envisions the parties to the operative contract, the claims for breach of fiduciary duty will reach different defendants. The claims will support different remedies. The claim for breach of contract is direct and supports a stockholder-level remedy. The claim for breach of fiduciary duty is derivative and supports a corporate-

112

level remedy. As framed in the Complaint, the claims serve different purposes. The breach of contract claim seems designed to invalidate the Challenged Awards. The breach of fiduciary duty claim seems designed to shift any losses that the Company may incur to the fiduciaries who caused the Company to incur them.

Similar observations could be made about the unjust enrichment claim. *See Pfeiffer*, 2013 WL 5988416, at \*10. The interaction between the unjust enrichment claim and the breach of contract claim admittedly presents a closer question. If the court invalidates Smith's awards as a matter of contract, then the unjust enrichment claim could be moot.

It will be challenging enough to think through those issues if and when the claim for breach of contract is resolved. At the pleading stage, the game is not worth the candle. Because the plaintiff is entitled to plead in the alternative under Rule 8, the court will not grant dismissal based on the defendants' arguments about duplicative claims.

## V.    CONCLUSION

The defendants attacked the Complaint using arguments that ignored established precedent, conflicted with the 2019 Plan and the Award Agreements, and contradicted the Company's own disclosures to its stockholders. This decision has rejected the defendants' positions. The plaintiff's claims are ripe, and the Complaint states claims for breach of contract, breach of fiduciary duty, and unjust enrichment. The ratification argument fails. The plaintiff does not have to choose a theory of the case at the pleading stage. The defendants' motion to dismiss is therefore denied.